KEY ENTERPRISES OF DELAWARE, INC., Plaintiff–Appellant,

v.

VENICE HOSPITAL, Sammett Corporation and Medicare Patient Aids Center, Defendants–Appellees,

Gulf Area Diversified Services, et al., Defendants.

No. 89–3086.

United States Court of Appeals, Eleventh Circuit.

Dec. 28, 1990.

Christopher K. Kay, Michael J. Beaudine, Orlando, Fla., Anthony Diresta, Morris, Manning & Martin, Atlanta, Ga., for Key Enterprises of Delaware, Inc.

Herbert T. Schwartz, Reinman, Harrell, Graham, Mitchell & Wattwood, Melbourne, Fla., for Venice Hosp. & Medicare Patient Aids Center.

Lynn Snyder, William G. Kopit, Washington, D.C., for Sammett Corp. & Medicare Patient Aid Center.

William Bell, Tallahassee, Fla., for amicus curiae Florida Hosp. Assoc.

C. Scott Sykes, Irving, Tex., for amicus curiae, Voluntary Hospitals of America, Inc.

Before KRAVITCH and CLARK, Circuit Judges, and ATKINS*, Senior District Judge.

CLARK, Circuit Judge:

## FACTS

This case concerns the rental and sale of durable medical equipment (DME) to home users in the Venice, Florida area. DME includes such things as prosthetic devices, hospital beds, oxygen equipment, wheelchairs and walkers. DME suppliers receive customers from many sources, including self-selection, referrals from hospitals, nursing homes and intermediate care facilities, home health agencies, physicians and physical therapists. The plaintiff, Venice Convalescent Aids Medical Supply (VCA), is one of several competing retailers of DME to non-institutionalized patients in the Venice, Florida area. The defendant Medicare Patient Aid Centers (MPAC) is also a DME supplier and is jointly owned by the Sammett Corporation and an affiliate of Venice Hospital.

In May 1984, the defendant Sammett established the defendant MPAC to provide DME equipment to the Venice, Florida DME market. About the same time, Venice Hospital began investigating the possibility of establishing a DME supply business and of entering into a joint venture with a home health care agency.[1] Venice Hospital contacted several pre-existing DME suppliers, including MPAC, regarding a possible joint venture. Venice Hospital also contacted several local home health agencies to discuss the home health care joint venture. Ultimately, in April 1985, an affiliate of Venice Hospital, Gulf Area Diversified Services (GADS), purchased from Sammett a one-half interest in Sammett's MPAC facility in Venice and thus established MPAC as a joint venture between Sammett and Venice Hospital's affiliate GADS. Venice Hospital is a not for profit subsidiary of Gulf Area Medical Programs which has another subsidiary, the for profit corporation, GADS.

During the course of these negotiations, the chief operating officer at Venice Hospital, Gary Bebow received a letter dated January 25, 1985 from Sam Shapiro, the president of Sammett Corp. In that letter, discussing Sammett's marketing strategy, Shapiro stated that the company "do[es] not set [its] sights only on the skimming off of captive referrals" in a highly regulated market, but that it intended to "market directly to patients and medical professionals." Shapiro testified at trial that captive referrals "refers to situations where the patients do not have the freedom of choice." He also stated that once he

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Home health care coordinators (or nurses) are registered nurses employed by independent companies known as home health care agencies. The agencies, through their employee nurses, provide skilled nursing care to patients in the patient's home after they are discharged from the hospital.

learned Venice Hospital was considering going into the DME business, he "thought it would be a good idea if [they] could put [their] energies together and have one less competitor in the area." Although Venice Hospital had not contacted VCA, upon learning of the possible joint venture, VCA contacted the hospital and suggested they discuss the matter. The hospital declined, noting that it had already entered into a joint venture with MPAC.

Venice Hospital is one of two existing hospitals in the Venice area and is a 312 bed acute care facility. The only other hospital in the area, Englewood, is a 100 bed facility which opened in December 1985. Venice Hospital has 76% of the available beds; patient records show it has 80% of patient admissions and 81% of the patient days in the Venice area. Venice Hospital has facilities to support most of the area residents' needs; its records show that 80% of the hospital's patients come from the Venice area. Patient records from the closest hospitals outside the Venice area show few Venice area residents going to those neighboring hospitals. The boundaries of the hospital's certificate of need correlate to the above defined area which provides 80% of the hospital's patients. Plaintiff's expert[2] concluded that Venice Hospital has monopoly power for acute care in the relevant geographic market.

Expert testimony adduced at trial shows that Venice Hospital patient DME referrals represent a significant portion of the total DME referral market in the Venice area. Plaintiff's expert opined that 64% of MPAC's current business comes from the hospital. The statistics showed that for the 1986–87 time frame, MPAC had 60.7% of the total DME business in Venice. This means that MPAC has garnered 39% of the total area DME market simply by captur-

ing an indeterminate percentage of Venice Hospital's DME referrals. Plaintiff's expert noted that MPAC is now receiving approximately 85% of all referrals from Venice Hospital. Assuming MPAC's share of business generated by hospital referrals is in equilibrium with MPAC's share of new referrals, then Venice Hospital discharges represent 46% of the total DME market in the Venice area.[3] Plaintiff's expert testified, however, that MPAC's current business from the hospital had not reached equilibrium with its share of new referrals from the hospital, indicating that MPAC's current business generated by the hospital is something less than 85%. This supports the conclusion that Venice Hospital's total DME referrals represent greater than 46% of the total area DME market. Plaintiff's expert concluded that the hospital represented an essential facility in terms of DME referrals. Defendant's expert contradicted this by saying that Venice Hospital DME referrals represent only 19% of the total area market.

Before the joint venture, it was common practice in the Venice DME market for home health care nurses to assist the patient in choosing the DME vendor who would supply the patient's DME needs. The home health care nurses have had training in DME usage and are capable to select DME equipment for patients. Home health care nurses are not employees of the hospital and are granted hospital privileges (access to patients) once they complete certain application and screening procedures. The plaintiff concentrated its sales efforts on the home health care nurses and physicians. Consequently, VCA received much of its DME business from hospital discharges and relatively little business from the other available sources. To ensure equal access among those home health

2. Plaintiff's expert Dr. Blair has considerable expertise in the antitrust economics area. He has published numerous articles and has co-authored a text book on the subject. Additionally, he has worked with the Antitrust Division of the Justice Department and has testified in numerous trials as an antitrust expert.

3. In a rental market where a firm's share of new referrals is increasing, the figures for current market share based on income will be lower than the figures for market share based on new referrals. Once the percentage of new referrals stabilizes and old accounts with competitors close out, the income based market share will approach the new referral market share.

agencies which have hospital privileges,[4] the hospital uses a rotation system. Several days before a patient requiring some form of follow-on care is discharged from the hospital, the hospital notifies whichever home health agency is next in the rotation. This allows a home health nurse from the agency to visit the patient and plan whatever follow-on care is needed. Pre-planning is essential to ensure that needed facilities are in place when the patient arrives home from the hospital. The home health care agencies rely on access to patients to remain in business.

The nurses testified that they would first inquire whether the patient had a choice of DME vendor; if the patient expressed no preference, the nurse would recommend a vendor based on the equipment the patient needed and the nurse's past experience with DME companies. All nurses who testified stated that only rarely did a patient or a patient's family have a preference for a particular DME vendor.

After the joint venture was created, Venice Hospital instituted a new policy encouraging home health care nurses to select MPAC as their DME supplier. The social services director at Venice Hospital held two meetings with the home health care nurses to impress on them the fact that the hospital would prefer they use MPAC. In an interoffice memorandum, Ronald Scherra then the senior vice president of the hospital told the social services director to "refer all patients to these hospital affiliated organizations [MPAC] unless the attending physician specifically refers the patient to a different supplier." Scherra testified that the memo was strictly interoffice correspondence and did not represent hospital policy. Mark Bowers an employee of MPAC became the patient equipment coordinator in the Venice Hospital's discharge planning department; his duties included meeting with the patients with anticipated needs for DME. Prior to his employment at Venice Hospital, Bowers

worked as a DME salesman and as a sales supervisor for Sammett. When he became patient equipment coordinator, Bowers had no training in follow-on health care.

Initially, the hospital structured its policy in order to prevent the home health care nurses from consulting with patients as to their DME requirements. Only after several home health care nurses complained did the hospital change its policy to allow the nurses to discuss DME requirements with patients. Thereafter, the home health nurse performed the DME assessment, that is, they determined which equipment the patient required. Nevertheless, it was Bowers who actually discussed with the patient which company would supply the needed equipment. The parties stipulated, however, that Bowers both performed the assessment and arranged the equipment rental. Thus, there seems to be some conflict between the evidence and the stipulation. The parties also stipulated that if a patient, home health nurse or physician made a request for a particular DME vendor in a particular case, Bowers would honor that choice. In the absence of such a choice, Bowers referred all DME business to MPAC. However, it was not always easy for patients to exercise free choice. One prior hospital patient, who ultimately received service from the company he requested (VCA), testified in a deposition that Bowers initially told him that the hospital did not do business with VCA. Bowers dismissed this as a misunderstanding.

Prior to Bowers' arrival, no DME vendor was permitted entry to solicit business in the hospital. After the joint venture, Bowers was permitted to visit patients in the hospital and solicit DME business. When Bowers visited patients, he wore a lab coat like other hospital officials. Bowers testified that approximately 50% of the patients needing DME are referred to MPAC through operation of the default rule; it was the hospital's policy to channel all patients who expressed no preference to

---

**4.** Both the home health care agency and its individual nurses must be granted hospital privileges to work with the patients while they are still in Venice Hospital. There are certain documentation requirements and the agency or nurse must submit an application. The application is reviewed by the executive committee of the medical staff which makes a recommendation to the board of directors. The board makes the final decision.

MPAC. Bowers also stated that of the remaining 50%—the patients who expressed a preference—70% chose MPAC. Thus, 85% of Venice Hospital patients needing DME received it from MPAC.

Only one of the home health care nurses stated that she felt pressured or leveraged by the hospital's policy to use MPAC. Those who said they did not feel pressured stated that they felt it best to cooperate with the hospital since they were guests there and relied on access to patients for their business. One nurse stated that she chose MPAC after the joint venture because she thought it best to cooperate given the "political climate" in the hospital. As noted above, at the same time negotiations between Sammett and Venice Hospital were in progress, Venice Hospital was simultaneously considering a similar exclusive arrangement with a home health agency. All of the home health care nurses testified that they were aware of these negotiations.

The evidence establishes that within six months after MPAC entered as a partner of the hospital, VCA's business began to drop significantly. Prior to the joint venture, VCA had 72.8% of the overall DME market, whereas MPAC had only 9.2%; two years afterwards, VCA retained 30% of the market and MPAC had acquired 61% of the market. All of the home health care nurses testified that they stopped using VCA as they had before the joint venture went into effect. The majority stated that before the joint venture they used VCA because of its superior service and cleanliness. None of them stated that VCA ceased to be superior in quality or service. Several of the home health care nurses stated that MPAC's quality and service were inferior.

The hospital had different rules regarding physicians' standing orders for home health agencies and DME companies. A standing order is a request by a physician which is kept on file by the hospital. The standing order makes the physician's preference for a particular home health agency, DME company, or other service known. The hospital follows the standing order unless the physician directs otherwise. The hospital's social services director, Ms. Higgins, testified that she maintains a physicians' standing order list for home health care agencies, but considers it too burdensome to do the same for DME suppliers. She maintained that while all home health services offered basically the same service, there is a wide variation of equipment available from the various DME vendors. She informed those physicians who requested DME standing orders that they would have to indicate their preference by noting the company on the patient's chart.

Two additional factors play a pivotal role in this case. First, there is little possibility of long-term vigorous price competition in the DME market. The maximum prices firms will charge is generally determined by what Medicare and Medicaid will pay. Thus, service, in all its possible forms, becomes the primary mode of competition. Second, the typical patient is not well versed in the DME market; they do not know the equipment or the vendors. This renders them vulnerable to suggestions made by those in positions of authority.

Plaintiff contends that the antitrust laws were violated by the joint venture and the attendant policy changes channeling most of Venice Hospital's DME business to MPAC. Plaintiff alleged, inter alia, that the defendants Sammett, Venice Hospital, and MPAC violated § 1 and § 2 of the Sherman Act by coercing or unduly influencing the home health agencies to refer their patients to MPAC and by unreasonably restricting and excluding competition in the Venice DME market. Plaintiff also alleged that the defendants violated § 2 of the Sherman Act by monopolizing or attempting to monopolize the Venice DME market. Finally, plaintiff alleged that the defendants had tortiously interfered with plaintiff's business relationship with the home health agencies.

After a three-week trial, the jury, in answers to special interrogatories, found that (1) the defendants had violated § 1 of the Sherman Act by conspiring to deal exclusively with at least one home health agency (2) that defendants violated § 2 of the Sher-

man Act by monopolizing and/or attempting to monopolize the DME market in the Venice area (3) that the defendants violated § 2 by conspiring to monopolize the Venice DME market (4) that Venice Hospital violated § 2 by using its monopoly power to gain an unfair advantage in the DME market in Venice and (5) that the defendants tortiously interfered with plaintiff's business relationship with the home health agencies. The jury awarded the plaintiff $760,983.00 in damages, which was then trebled on the antitrust counts to $2,282,949.00.

Following a jury trial, the defendants Venice Hospital, the Sammett Corporation and Medicare Patient Aid Centers filed a motion for judgment notwithstanding the verdict, or for new trial, or for remittitur, which the plaintiff opposed. The district court granted the defendants' JNOV motion, concluding that there was insufficient evidence to support the jury's verdict. Specifically the court concluded that "[t]he evidence simply does not support a finding that defendants' behavior was coercive or unreasonably exclusionary, or in other words, that competition was injured." The court also concluded that "defendants' conduct was economically rational, it did not exclude or restrict the freedom of the patient, home health care nurses or doctors to choose the DME vendor of their liking, nor did it unreasonably exclude other DME vendors from competing in the DME market." *Key Enterprises of Delaware, Inc. v. Venice Hosp.*, 703 F.Supp. 1513, 1519 (M.D.Fla.1989).

## DISCUSSION

### I. STANDARD OF REVIEW:

In reviewing the grant of a judgment notwithstanding the verdict, we apply the standard set forth in *Boeing v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc):

> On motions ... for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the nonmover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied.

More recently we have added:

> A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence.

*Michigan Abrasive Co. v. Poole*, 805 F.2d 1001, 1004 (11th Cir.1986). *See also Reynolds v. CLP Corp.*, 812 F.2d 671, 674 (11th Cir.1987); *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1494–95 (11th Cir.1987). We review a motion for judgment notwithstanding the verdict on the same footing as the district court. *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 841 (5th Cir.1975). When evaluating the evidence, neither the district court nor this court may *reweigh* the evidence or assess credibility. *Popham v. City of Kennesaw*, 820 F.2d 1570, 1576 (11th Cir.1987). From our examination of the rather extensive record, we have concluded that the district court departed from this rule and erred in holding that there was insufficient evidence to support the jury's finding of antitrust liability.

### II. ANTITRUST CLAIMS:

#### A. *Anticompetitive Acts*

As with any antitrust case, this one turns on whether certain acts committed by the defendant were anticompetitive or tended to prevent competition on the merits. As noted above, VCA asserted that the defen-

dants violated the antitrust laws in a variety of ways and cited a number of legal theories to support their arguments. The jury found the facts to be as claimed by the plaintiff on every count. Given the importance of the defendants' anticompetitive acts to the outcome of this case, it is useful to summarize those acts here before we discuss at length each of VCA's legal claims: (1) Venice Hospital, MPAC and the Sammett Corporation entered into a reciprocal agreement with the home health care nurses whereby the nurses would preferentially recommend MPAC in exchange for continued access to the hospital's patients; (2) The hospital changed its policy which previously allowed no DME vendors access to patients, to one which allows only one DME vendor, Bowers, access to discuss DME with patients, and the hospital could offer no efficiency justification for this change; (3) Bowers acting on behalf of the hospital and MPAC held himself out as having a position of expertise and authority in the hospital; (4) The Sammett Corporation pursued the joint venture because it wanted to eliminate a potential competitor and exclude other competitors from access to captive referrals; (5) The hospital maintained different standing order rules for home health care nurses as compared to DME suppliers and could offer no legitimate reason for the distinction; (6) The hospital and MPAC through Bowers used a default rule which automatically selected MPAC if the patient did not make a choice of DME supplier, (the home health care nurses were selected on a rotating basis); (7) The hospital used its monopoly power in the acute care field to leverage itself into the DME market with the intent to avoid competition in the DME market on the merits.

The fact that the hospital gave Bowers access to the patients and how that contributed to channeling patient choice requires additional clarification. The district court reviewed the evidence and concluded that the defendants had committed no action-able anticompetitive acts. Much has been said about patient choice in this case. The district court noted that the parties stipulated that the patients had the freedom to choose any DME vendor. However, a patient's freedom to choose under these circumstances may be illusory. The evidence presented in this case shows that patients rarely have a preference for a DME vendor.[5] The patients know very little about the equipment or the companies that rent the equipment. Thus, they are very susceptible to recommendations made by anyone who appears to be knowledgeable on the subject. It therefore becomes very easy to channel patient choice by limiting the patient's exposure to the competition. This the hospital accomplished principally in two ways. First, by changing its policy, it limited the home health care nurses' ability to discuss DME vendors with the patients prior to their discharge. The initial policy change following Bowers' arrival in the hospital was that he would discuss the patient's DME needs with the patient, make the DME assessment, and order the equipment. After several nurses complained, the hospital changed its policy and nurses were again allowed to make the DME assessment for their patients. The nurses were "encouraged" to recommend MPAC which they did because of the "political climate" at the hospital.

The hospital's second policy change was to allow one DME vendor in to solicit business from the patients. Previously it had denied vendors access to the hospital. The district court noted that the no solicitation rule was in effect before the joint venture and concluded that the rule "could not constitute evidence that the defendants behaved improperly after the joint venture." 703 F.Supp. at 1518. We disagree. The change was that the hospital now allowed an exception to the rule, but only in the case of its affiliate. The evidence was uncontroverted that MPAC is a for profit business and that Bowers is an MPAC employee. Bowers has experience as a DME

---

5. Bowers testified that approximately 50% expressed an affirmative choice; his logs showed that figure to be closer to 40%. It seems to us interesting—and the jury could have noted this as well—that there was such a large discrepancy between MPAC's evidence and the testimony presented by the home health care nurses.

salesman and supervisor of salesmen. It is obvious that he was allowed to solicit business in the hospital as an MPAC salesman. The fact that the hospital made him the DME coordinator for the hospital and allowed him to wear a lab coat obscured his role insofar as patients were concerned, but highlighted the change in policy insofar as the jury was concerned.

Appellees claim that the antitrust laws do not compel them to grant other DME vendors access to their patients and that they have a right to deal with whomever they choose. As the Supreme Court has stated: "We do not dispute that general right. 'But the word "right" is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified.'" *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 187, 96 L.Ed. 162 (1951). In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 2858, 86 L.Ed.2d 467 (1985), the Supreme Court upheld liability in part because "the monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years." *Id.* Thus, Venice Hospital's decision to allow an MPAC salesman access to patients and initially limit the home health care nurses' authority to discuss patients' DME needs was a "decision by a monopolist to make an important change in the character of the market." *Id.* The outcome in *Aspen Skiing* turned on whether the record supported the jury's conclusion that there were no valid business reasons for Ski Co.'s refusal to deal with a competitor. In analyzing the record, the Court noted that Ski Co. was unable to produce "any efficiency justification whatever for its pattern of conduct." *Id.* 105 S.Ct. at 2860. Additionally, the Court found that Ski Co. had engaged in economically irrational behavior by foregoing "short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Id.* at 2861. The district court incorrectly concluded that economically irrational behavior, i.e., behavior which results in lost profits, was a necessary condition to the Court's holding. This demonstrates an unjustifiably narrow view of *Aspen Skiing*. The presence of economically irrational behavior made the record in that case "*comfortably* support[ ] an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival." *Id.* (emphasis added). The operative question is whether the hospital can offer any efficiency reason for its behavior. *Id.* at 2860–61. We can find no efficiency justification in the record. We also note that as we above summarized the hospital's refusal to allow other DME vendors access is but one of several identifiable anticompetitive acts which when viewed together support the jury's findings that the defendants' actions have impaired competition in an unnecessarily restrictive way.

Appellees argue that since the joint venture was legitimate, any benefits that Venice Hospital, MPAC and Sammett derive from the integration is likewise legitimate. We think appellees err in leaping to this conclusion. VCA has not challenged the joint venture as such and, therefore, we have assumed the joint venture is legitimate.[6] VCA's complaint relates to the manner in which the defendants implemented the joint venture and to their intent in forming the joint venture. Our discussion here extends no further than the case presented.

---

**6.** In its brief as *amicus curiae,* Voluntary Hospitals of America, Inc. argues that vertical integration is necessary for hospitals to survive in the present day health care industry. This may be the case; however, the health care industry has no blanket immunity from the antitrust laws. *Jefferson Parish Hosp. v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 1565 n. 42, 80 L.Ed.2d 2 (1984). In *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 1031, 35 L.Ed.2d 359 (1973), the Court rejected Otter Tail's argument that it needed to exclude possible competitors to survive and concluded that the Sherman "Act assumes that an enterprise will protect itself against loss by operating with superior service, lower costs and improved efficiency." Our decision today does not limit the ability of firms to vertically integrate when that integration does not unnecessarily exclude competition, or is not undertaken to monopolize or restrain trade.

## B. *Antitrust Injury*

Appellees claim and the district court found that VCA had failed to demonstrate that it had suffered any antitrust injury. The district court observed that "the underlying policy and purpose of the antitrust laws is to protect competition and not competitors." 703 F.Supp. at 1513 (citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986)). The district court's failure to recognize antitrust injury in this case stems from its failure to recognize the defendants' anticompetitive acts as such. As we explained above, defendants engaged in a number of anticompetitive acts which, if causally related to VCA's alleged injury, support a finding of antitrust injury. Recently the Supreme Court reaffirmed its holding in *Cargill* and concluded that "a plaintiff must prove the existence of '*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Atlantic Richfield Co. v. USA Petroleum Co.*, — U.S. ——, ——, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 698, 50 L.Ed.2d 701 (1977) (emphasis in original)). In *Atlantic Richfield*, a competitor sought to challenge a vertical maximum price-fixing arrangement. The Supreme Court noted that it is impossible for such a scheme to do injury to the competitor. The danger in price fixing arrangements identified in *Albrecht v. Herald*, 390 U.S. 145, 152–53, 88 S.Ct. 869, 873, 19 L.Ed.2d 998 (1968), is that they tend to stifle a small distributor's ability to compete with a larger distributor because the small distributor may, at the low maximum price, be unable to provide the services demanded in a competitive market. A competitor not bound by the price ceiling, the Court reasoned, could not be harmed by the price-fixing agreement. Additionally, the court noted that a competitor could not be injured by a conspiracy to fix minimum prices. A competitor can only stand to gain from a conspiracy to raise a market price. *Matsushita Elec. Industrial Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 582–83, 106 S.Ct. 1348, 1353–54, 89 L.Ed.2d 538 (1986).

VCA's claim suffers from none of these infirmities. VCA claims that defendants' practices have unreasonably restricted competition by channeling patient choice to defendants and by excluding all competing DME vendors' access to Venice Hospital's patients. The antitrust laws were intended to prevent unreasonably exclusionary practices. VCA's injury flows directly from that which makes the defendants' acts unlawful. Appellees claim and the district court agreed that VCA failed to show that the patients as the consumers, suffered any injury. As we discussed above, the channeling of patient choice is sufficient to show injury to consumers. The antitrust laws do not require the consumer to suffer some form of monetary damage before a defendant's anticompetitive conduct is actionable. *See Aspen Skiing*, 105 S.Ct. at 2859–60 (consumers injured by not having easy access to all four mountains). *See also Association of General Contractors of Cal. v. California St. Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 903, 74 L.Ed.2d 723 (1983) ("Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions and may be condemned even without proof of its actual market effect."). Injury to competition may be shown even though injury to the consumer is practically nonexistent. *Cf. Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973) (electric utility that dominates transmission of power in most of its service area may not use that "dominance to foreclose potential entrants into the retail area from obtaining electric power from outside sources of supply"); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 536 (7th Cir.1986) ("The antitrust laws are concerned with the competitive *process*, and their application does not depend in each particular case upon the ultimate demonstrable consumer effect.") (emphasis added). We recognize that *Otter Tail Power* was a civil antitrust suit brought by the government and not a

private plaintiff. This does not alter the Court's conclusion that Otter Tail's exclusionary practices "foreclose[d] competition." *Id.* This case is significant because in selecting which power company will serve an area, the consumer plays a minor, if not nonexistent, role.

■ Thus, a court must consider the effect on competition and not simply the effect on the ultimate consumer.[7] In the DME industry, because of the regulated nature of Medicare and Medicaid reimbursements, the primary means of competition is quality and service. The defendants here have knowingly and purposefully set in place a scheme which insulates the unknowing patient from learning of these nuances. Competition has been injured because there is no effective means by which competing DME vendors can reach those patients who require DME when they are discharged from the hospital. The Supreme Court has aptly stated:

> A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare.... Absent some countervailing procompetitive virtue—such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services—such an agreement *limiting consumer choice by limiting the "ordinary give and take of the market place,"* cannot be sustained....

*Federal Trade Commission v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986) (federation of dentists refused to forward certain information (X-rays) to their patients' insurance companies) (emphasis added). The Court then stated that "even if the desired information were in fact completely

useless to the insurers and their patients in making an informed choice ... the Federation would still not be justified in deciding on behalf of its members' customers that they did not need the information." *Id.* 106 S.Ct. at 2020. Elsewhere the Court has stated "even if the customer is indifferent among brands of the second product and therefore loses nothing by agreeing to use the seller's brand of the second in order to get his brand of the first, such tying agreement may work significant restraints on competition in the tied product." *Jefferson Parish Hosp. v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 1558 n. 19, 80 L.Ed.2d 2 (1984). Finally, we note that in *Association of General Contractors,* the Supreme Court concluded that the Union did not suffer antitrust injury because "the Union was neither a consumer nor a competitor in the market in which trade was restrained." 103 S.Ct. at 909. The Court expressed some doubt as to whether the Union's goal was robust competition. *Id.* In the instant case, the plaintiff is a competitor in the market in which trade was restrained and VCA's injury is "inextricably intertwined" with the injury which the conspirators imposed on the DME consumers. *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 484, 102 S.Ct. 2540, 2551, 73 L.Ed.2d 149 (1982). We have no difficulty concluding as did the jury that VCA suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." —— U.S. at ——, 110 S.Ct. at 1889. We now turn to VCA's claims under Sections 1 and 2 of the Sherman Act and under state law for tortious interference with VCA's business relations.

## C. *Section 1 Conspiracy*

VCA argues that the jury verdict on its Section 1 claim was proper because it

---

**7.** The district court noted that prices have actually gone down and that the market is less concentrated than it was prior to the joint venture. 703 F.Supp. at 1519. Dr. Blair testified that the Herfendall–Hirschman Index—a measure of market concentration—dropped from 5708 when VCA's market share was at its peak to 4780 now. Appellees argue that this shows the joint venture has had a procompetitive effect

on the market. The Department of Justice Merger Guidelines use this methodology to evaluate whether a merger will result in impermissible market concentration. *See* A. Stickells, *Federal Control of Business,* 1989 Cumulative Supplement, Appendix A at 627 (1989). The Department considers a market with an Index over 1800 to be highly concentrated. *Id.*

presented substantial evidence in support of its contention that the defendants entered into a reciprocal agreement with one or more of the home health agencies whereby the home health care nurses would continue to have access to patients prior to discharge in exchange for the nurses preferentially referring their patients to MPAC. The district court analyzed this reciprocal agreement as a tying case and concluded that VCA had failed to prove that Venice Hospital's condition for continued access to the hospital "reached the level of a mandatory requirement." 703 F.Supp. at 1517. The court relied on *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033 (5th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981), a former Fifth Circuit tying case and held "that defendant's behavior, as a matter of law, was not unlawfully coercive." *Id.* While reciprocal dealing as an antitrust violation has significant conceptual similarity to tying, we conclude that the district court erred by applying the strict tying standard for coercion to this reciprocal dealing case.

Reciprocal dealing has received little attention in the courts; however, when the subject has arisen, courts have not hesitated to condemn the practice. In a tying arrangement, a seller uses its power in the market for product A to coerce the buyer of product A to purchase product B. But "[a] reciprocal dealing arrangement exists when the two parties face each other as both buyer and seller." *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419, 424 (5th Cir.1978). The buyer of product A offers to buy from the other party, but only if that second party will buy product B from the first party. A typical example is where a producer of aluminum ingot sells to a manufacturer who uses the ingot to manufacture equipment used to produce the ingot. *See* L. Sullivan, *Antitrust* § 170 at 490 (1977). In *Spartan Mills*, the court noted that reciprocal dealing cases were similar to tying cases since "[i]n each case one side of a transaction has special power in the market place," and observed that "[i]n reciprocal dealings a buyer with economic power forces a seller to buy some-

thing from it to sell its goods." 581 F.2d at 425. It is clear that such coercive conduct is sufficient to run afoul of the Sherman Act; however, it is equally clear that "[r]eciprocal trading may ensue not from bludgeoning or coercion but from more subtle arrangements. A threatened withdrawal of orders if products of an affiliate cease being bought, as well as a conditioning of future purchases on the receipt of orders for products of that affiliate is an anti-competitive practice." *Federal Trade Commission v. Consolidated Foods Corp.*, 380 U.S. 592, 85 S.Ct. 1220, 1222, 14 L.Ed.2d 95 (1965) (concerning potential for reciprocal dealing as basis to challenge merger). In the context of an alleged tying claim, the Supreme Court has stated:

> This type of market power has sometimes been referred to as "leverage." Professors Areeda and Turner provide a definition that suits present purposes. "Leverage is loosely defined here as a supplier's power to *induce* his customer for one product to buy a second product from him that would not otherwise be purchased solely on the merit of that second product." 5 P. Areeda & D. Turner, Antitrust Law ¶ 1134a, p. 202 (1980).

*Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 1559 n. 20, 80 L.Ed.2d 2 (1984) (emphasis added). The word "induce" clearly contemplates conduct short of an absolute command. The commentators take this a step further. One has concluded that, "[w]e ought to have no compunction about inhibiting a firm from buying from a customer if it does so not because it regards the customer's offering as best, but because it sees this transaction as a way to bind the customer to it as a customer." L. Sullivan, *supra* at 494. Sullivan observes:

> it may in some cases be possible to identify reciprocity as the motive for a transaction with considerable assurance ... and if [a] firm then begins systematically switching its purchases from sellers who could not also be buyers from it to firms which could, we ought not to hesitate to

label the purchases as being made from a reciprocal motive. *Id.* at 494–95. *See Betaseed, Inc. v. U and I, Inc.*, 681 F.2d 1203, 1216–17 (9th Cir. 1982) (applying per se rule to coercive reciprocity, but recognizing that "[t]he spectrum of the practice ... extends from the use of overt coercion to the use of a mutual patronage arrangement"); *United States v. General Dynamics Corp.*, 258 F.Supp. 36, 57 (S.D.N.Y.1966) (reciprocity, whether mutual or coercive, serves to exclude competitors).

■ In the instant case VCA has relied on a theory of coercive reciprocity to support its Section 1 conspiracy claim. The arrangement in this case does not fit precisely the contours of either a classic tying or a reciprocal arrangement; however, the court instructed the jury on the basis of VCA's reciprocal dealing claim and no party objected. Since we find that the arrangement between defendants and the home health agencies has sufficient elements of a reciprocal arrangement, we analyze the evidence VCA presented to support its claim under the law governing such arrangements. Additionally, we do not think it necessary to divide reciprocity cases into two categories; i.e. coercive and mutual. An antitrust plaintiff may succeed on a claim of coerced reciprocity even if the coercion involved in the case does not rise to the level required for per se treatment. *See Spartan Grain*, 581 F.2d at 425; *Betaseed*, 681 F.2d at 1217. If the element of coercion necessary for per se treatment is not present, a court will analyze the case under the rule of reason. 581 F.2d at 425 n. 6. Therefore, we conclude that where a plaintiff's evidence shows that one party has sufficient market power to unduly influence a second party to treat the first more favorably than the free market would otherwise dictate, and the second party acts in conformity with the reciprocal arrangement, the plaintiff has proved the existence of an arrangement which unreasonably restrains trade. *Cf. Spartan Grain & Mill Co. v. Ayers*, 735 F.2d 1284, 1288 (11th Cir.1984) (appeal after remand) (jury must find that defendant had an economic advantage in the tying product market which could be used to induce or coerce the victim to accept the tied product). Heightened scrutiny is justified in the instant case since we are confronted with a conspiracy.

Section 1 of the Sherman Act, in contrast, reaches unreasonable restraints of trade.... Concerted activity subject to § 1 is judged more sternly than unilateral activity under § 2.... Whatever form the inquiry takes, however, it is not necessary to prove that concerted activity threatens monopolization.

The reason Congress treated concerted behavior more strictly than unilateral behavior is readily appreciated. Concerted activity inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands.... Of course, such mergings of resources may well lead to efficiencies that benefit consumers, but their anticompetitive potential is sufficient to warrant scrutiny even in the absence of incipient monopoly.

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). To recover on its Section 1 claim, a plaintiff must also show that it suffered an antitrust injury which is causally related to the challenged conduct. This aspect has already been addressed.

■ The district court concluded that the home health care nurses lost none of their autonomy to select any DME supplier. 703 F.Supp. at 1517. We disagree and have no difficulty concluding that VCA presented sufficient evidence to support the jury's finding that a reciprocal arrangement existed between those defendants checked on the interrogatory and at least one home health care agency. While only one of the home health care nurses admitted she felt leveraged, several others stated that they thought it best to cooperate. All nurses who testified stated that they were aware that the hospital was considering an exclusive arrangement with one of the home health agencies. The testimony of all the home health care nurses indicated that VCA was superior to MPAC in quality and

service and that they recommended VCA to most of their patients. VCA's superiority did not change, yet the nurses started recommending MPAC in lieu of VCA. Plaintiff placed in evidence a memo from a former senior vice president of the hospital to the social services director instructing her to "refer all patients to these hospital affiliated organizations unless the attending physician specifically refers the patient to a different supplier." Following the joint venture, the hospital initially instituted a policy which substantially curtailed the nurses' opportunity to discuss with a patient his or her DME needs; i.e., perform a DME assessment. However, after several of the nurses complained, the nurses were again allowed to perform a patient's assessment. The plaintiffs presented uncontroverted evidence that VCA's business started to decline immediately after the joint venture went into effect. It bears noting that MPAC had been in the Venice market for some time prior to that, during which time VCA suffered no appreciable change in market share.

While no individual piece of the evidence presented may be sufficient to support the jury's finding, when viewed as a whole the evidence reasonably supports the inference that because of a possible threat to their job security and in response to the hospital's solicitations, the home health care nurses preferentially recommended MPAC over other competing DME vendors. That the nurses did not testify that they were coerced is not essential to VCA's claim, nor is it surprising as many of these nurses must have access to the hospital to survive. We do not here attempt to guess what the jury may have relied upon to reach its decision, we merely note that the element of coercion which the district court found so lacking in this case may have been apparent to the jury. Contrary to the district court, we find supportive of the jury's finding a reciprocal arrangement that the home health care nurses were in part motivated by their own self interest.

■ In its opinion, the district court did not discuss the jury's finding that defendants Venice Hospital, MPAC and the Sammett Corporation were participants in the conspiracy; however, since appellees here contend that the evidence was insufficient on this element, we will address their concern. We are aware of the Supreme Court's recent admonition that the plaintiff must show that the conspiracy is "economically reasonable" and must present evidence which "tends to exclude the possibility that the manufacturer and nonterminated distributor[ ] [were] acting independently." *Matsushita Elec. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Delong Equip. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1508 (11th Cir.1989). We conclude that the evidence of each defendant's participation in the conspiracy meets that test and is sufficient to support the jury's verdict. The actions taken by the conspirators was to their mutual benefit. Direct evidence of each defendant's knowing participation is not required, instead it may be established through proof of surrounding circumstances. *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 252–54, 60 S.Ct. 811, 858, 84 L.Ed. 1129 (1940); *Bolt v. Halifax Hosp. Medical Center*, 891 F.2d 810 (11th Cir.1990). Additionally, a conspiracy need not be express or formally agreed upon. *Halifax Hosp.*, 891 F.2d at 810; *Gainesville Utilities v. Florida Power & Light*, 573 F.2d 292, 301 (5th Cir. 1978). The result in *Gainesville Utilities* was supported by the finding that "concerted action was contemplated and invited." 573 F.2d at 301 (quoting *Interstate Circuit v. United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939)).

The hospital made it known to the home health care nurses that they were to recommend MPAC. The hospital was responsible for creating a climate where the nurses felt it necessary "because of the political climate" to ingratiate themselves to the hospital. The hospital invited concerted action and the home health care nurses cooperated. The hospital, predictably, graciously accepted the nurses' cooperation. MPAC was involved through the participation of its agent Bowers who was positioned to receive the orders from the patients or nurses which in the absence of the recipro-

cal arrangement would have been placed in a competitive market. He was aware of the hospital's policies regarding the home health care nurses and of the change in policy which allowed him, a representative and employee of MPAC, to solicit business in the hospital when no other DME representative was allowed such access. The Sammett Corporation entered this arrangement intent on eliminating competition. The trial court instructed the jury on the requirements for a finding of knowing participation in a conspiracy. In closing argument, attorneys for MPAC and Sammett argued that the plaintiffs had failed to prove knowing participation in a conspiracy with the home health care nurses. Nevertheless, the jury found that the above named defendants participated in the conspiracy with the nurses and each other.

It is axiomatic that members of a conspiracy need not be aware of, or consent to each act committed in furtherance of the conspiracy to be held liable as a co-conspirator. *United States v. Walker*, 720 F.2d 1527, 1538–39 (11th Cir.1983) (evidence sufficient to support conviction for conspiracy to distribute narcotics). *See Socony–Vacuum*, 310 U.S. at 253–54, 60 S.Ct. at 858 ("an overt act of one partner may be the overt act of all without any new agreement specifically directed to that act"). The evidence recited in preceding paragraphs is but a part of the anti-competitive conduct in which these defendants engaged. We have already discussed other anticompetitive acts, *supra*. Appellees would have this court analyze each of VCA's claims as if they were completely separate lawsuits. Their suggested approach would be improper. When analyzing the evidence as to whether it supports a finding of conspiracy, the Supreme Court has stated:

> [P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after

scrutiny of each. "... [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.... [A]nd in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it."

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962) (quoting *American Tobacco Co. v. United States*, 147 F.2d 93, 106 (6th Cir.1944)) (citations omitted).[8] We conclude that VCA has presented sufficient substantial evidence to support the jury's finding that the defendants and at least one home health agency entered into a reciprocal agreement which had the effect of excluding VCA from having access to patients discharged from Venice Hospital.

## D. *Section 2 Conspiracy*

 Conspiracy to monopolize under Section 2 is somewhat different from its Section 1 counterpart and requires: (1) concerted action by knowing participants who have specific intent to achieve a monopoly; and (2) "the commission of at least some overt act in furtherance of the conspiracy." L. Sullivan, *supra*, § 49 at 132. Unlike attempt to monopolize under Section 2, a plaintiff alleging a conspiracy to monopolize need not prove that the conspiracy has a dangerous probability of success. *International Distribution Centers, Inc. v. Walsh Trucking*, 812 F.2d 786, 795–96 & n. 8 (2nd Cir.1987). *See* 3 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 9.02[1] at 9–35 (1986). *Cf. American Tobacco Co. v. United States*, 328 U.S. 781, 789, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575 (1946) (conviction for conspiracy to monopolize may stand even if conspirators had not "acquired the power to carry out the object of the conspiracy").

---

**8.** The hospital argues that it simply asked the home health care nurses to use its affiliated DME vendor and that its conduct is no different from any competitor hawking its product. During the argument on its motion for a directed verdict, appellees' counsel rhetorically asked "what was the hospital supposed to do?" Coun-

sel questioned whether the hospital was supposed to encourage the home health care nurses to use competing DME vendors. We have set out in this opinion the conduct which may be described as anticompetitive. The list includes much more than the simple hawking of wares.

In *Matsushita,* the Supreme Court emphasized that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." 106 S.Ct. at 1356. The Court also reaffirmed that "courts should not permit factfinders to infer conspiracies when such inferences are implausible." 106 S.Ct. at 1359. In *Matsushita,* the plaintiffs had alleged a conspiracy to engage in predatory pricing; however, the plaintiffs also alleged that the predation period was to have extended over a period of twenty years. *Id.* Predatory pricing typically involves pricing below some measure of cost which the competition cannot meet for a period of time until the competition is driven out of business. Once the competition is gone, the surviving firm can charge supercompetitive prices, recoup its short term losses and reap monopoly profits. *Id.* at 1357–59. The Court observed that a conspiracy to engage in predatory pricing is unlikely because of problems in coordination and policing. The Court concluded that it was simply implausible that the firms would sustain losses for two decades in the hope that they may at some future time recoup their losses and reap monopoly profits. *Id.*

■ In the instant case, the jury found that Venice Hospital, MPAC and Sammett had specific intent to monopolize the DME market in the Venice area. Unlike the scheme in *Matsushita,* the conspiracy alleged here is most plausible. In its simplest form, the defendants have conspired to monopolize the DME market by adopting policies which exclude competing DME vendors, by unduly influencing the home health care nurses to preferentially recommend MPAC over competing DME vendors, and by using the hospital's market power in the acute care market to gain an unfair advantage in the DME market. Conspirators are unlikely to broadcast their unlawful intent; thus, specific intent to monopolize must often be inferred from a defendant's acts. L. Sullivan, *supra,* § 51 at 135. In the instant case, we conclude that the defendants' acts when viewed as a whole support an inference that the defendants had specific intent to monopolize.

The jury's finding that defendants engaged in a conspiracy to monopolize was supported by substantial evidence.

E. *Attempt to Monopolize*

To succeed on its claim that MPAC attempted to monopolize the DME market, VCA's evidence must show that (1) MPAC had specific intent to monopolize the DME market and (2) MPAC had a dangerous probability of success. *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951); *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 850–51 (5th Cir.1975). Dangerous probability has not always been a separate and distinct element of an attempt to monopolize claim. *See American Tobacco Co. v. United States,* 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946); *Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905). However, dangerous probability has come to serve as a sort of protective feature which shields what may be only intensely competitive conduct from liability under the antitrust laws. Handler, *Reforming the Antitrust Laws,* 82 Colum.L.Rev. 1287, 1352–53 (1982). A dangerous probability of success might be found when the defendant's market strength approaches monopoly power. Other factors to consider are the relative strength of the defendant's competitors and whether significant barriers to entry exist. *White & White, Inc. v. American Hosp. Supply Corp.,* 723 F.2d 495, 506–07 (6th Cir.1983).

■ Dangerous probability of success is the only primary element necessary to this claim which we have not previously discussed. The judge instructed the jury that "[a] dangerous probability of success need not mean the success was nearly certain. It means that the chance of success was substantial and real. That is, that there was a reasonable likelihood that the defendant MPAC would ultimately achieve its goal of monopoly power." As noted above, the relevant market and defendant's market share are inter-related to whether the defendant has a dangerous probability of success. To support an attempt to mo-

nopolize claim, a plaintiff must present evidence of the relevant product and geographic markets and evidence which shows that the defendant's conduct had an anticompetitive effect in those markets. *American Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1579 (11th Cir.1985). The plaintiff's expert witness Dr. Blair testified extensively as to the relevant geographic and product markets and as to the defendant's share of the DME referrals from Venice Hospital and from the rest of the relevant market. The defendant's expert also testified at length and offered his version of the market definitions and market shares which differed from plaintiff's expert. The district court did not disturb the jury's explicit and implicit findings as to product and geographic markets and as to market shares. Defendant asserts that Dr. Blair's version is incorrect and cites only its expert's testimony to support its position; MPAC, however, offered no substantive basis for the claim that their expert's testimony was more trustworthy. The jury was correctly instructed on the use of expert testimony and was free to accept or reject any or all of either expert's testimony. Apparently they found Dr. Blair's testimony more convincing.

Dr. Blair's testimony supports a finding that MPAC captured 39% of the total area DME market simply by capturing a large percentage of Venice Hospital's referrals. His testimony also supports a finding that Venice Hospital represents at least 46% of the total DME market in the Venice area. The evidence also showed that over a two-year period, starting just before the joint venture went into effect, MPAC's total area market share rose from 9.2% to 61%. Plaintiff also presented evidence that shows that the challenged practices have had an adverse effect on other competitors in the market; one other DME vendor has gone out of business and another's demise appears imminent. The remaining competitors are small in comparison to VCA which in 1987 retained 30% of the market. In a section on vertical mergers, Professor Sullivan has identified another factor we think relevant in this case. He refers to it as the "need for integrated entry." L. Sullivan,

*supra*, § 210 at 659. Generally, it involves the notion that the linking of two firms at different levels in the market may reduce the likelihood of independent entry at either level. The instant case provides an excellent example. Venice Hospital and MPAC are currently linked. MPAC has practically guaranteed itself half the DME market in Venice area simply by capturing Venice Hospital's referrals. Any DME vendor contemplating whether to open a business in the Venice area will have difficulty competing with MPAC because MPAC is linked to the largest DME source in the market. This creates circumstances where it is necessary for a new competitor who wishes to enter the market, to be similarly integrated; that is, it must also have a large guaranteed referral source. Notably, one Sarasota DME vendor who attempted to break into the Venice DME market testified that he could not get a toehold in Venice because MPAC had locked up the market by affiliating with the hospital. The evidence recited above is sufficient to support the jury's finding that MPAC attempted to monopolize the Venice DME market because it demonstrates defendant's intent to monopolize and that it had a dangerous probability of success.

### F. *Monopoly Leveraging as an Attempt to Monopolize*

In its simplest form, a firm is guilty of monopoly leveraging if it uses market power in one market to gain market share in another market other than by competitive means. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 276 (2d Cir.1979) ("the use of monopoly power attained in one market to gain a competitive advantage in another is a violation of § 2, even if there has not been an attempt to monopolize the second market"). This doctrine is limited by the view that "a large firm does not violate § 2 simply by reaping the competitive rewards attributable to its efficient size, nor does an integrated business offend the Sherman Act whenever one of its departments benefits from association with a division possessing a monopoly in its own market." *Id.*

This theory has been embraced by the Sixth Circuit in *Kerasotes Mich. Theatres v. National Amusements*, 854 F.2d 135, 136–37 (6th Cir.1988), and specifically re-affirmed by the Second Circuit in *Grand-Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 681 (2d Cir.1985). Both the D.C. Circuit and the Ninth Circuit have expressly reserved judgment for a case that squarely raises the issue. *See Catlin v. Washington Energy Co.*, 791 F.2d 1343, 1346 (9th Cir.1986); *Association for Intercollegiate Athletics for Women v. NCAA*, 735 F.2d 577, 586 n. 14 (D.C.Cir.1984). In *Grandlight*, the court summarized the requirements for liability as follows: "monopoly power in one market; the use of that power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor in another distinct market; and injury caused by the challenged conduct." 771 F.2d at 681 (citations and quotations omitted). The Sixth Circuit has concluded that

> while the alleged agreement between [defendant] and its film distributors is vertical, the effect is exclusively horizontal. The sole purpose for such an agreement is to extend a business' dominance from one market into a second market, without having to achieve that dominance in the second market by developing a superior product or as the result of other legitimate competitive advantages.

*Kerasotes*, 854 F.2d at 137.

■ There exist plausible business reasons for the hospital's desire to enter the DME market and the jury might have concluded that Venice Hospital and MPAC are simply reaping the rewards of integration. The jury, however, concluded otherwise. When we scrutinize the hospital's means of implementation in light of all the circumstances present in this case, we have no difficulty concluding Venice Hospital purposefully abused its monopoly power in the acute care market to exclude MPAC's competitors from a significant and perhaps essential segment of the DME market in the Venice area.

Appellees contend that monopoly leveraging is not a separate offense under Sec-

tion 2. While we harbour some reservation about the Second Circuit's conclusion that no attempt to monopolize the leveraged market need be proved, that aspect of the monopoly leveraging theory is not problematic in this case. The judge charged the jury in part as follows:

> In order to win on this claim the plaintiff must have proved each of the following elements by a preponderance of the evidence.
>
> First, that the defendant Venice Hospital had monopoly power in the primary hospital services market as alleged. Second, that the defendant Venice Hospital willfully used that power to foreclose competition, gain a competitive advantage or destroy a competitor in a different market. And third, that plaintiff was injured in its business or property because of defendant's conduct.

In explaining the means by which plaintiff could prove "willful" use of monopoly power the judge stated that plaintiff

> may do so by showing that the defendant Venice Hospital's conscious objective was to use its monopoly power in primary hospital services to obtain an unlawful competitive advantage or to injure its competitors and competition in the Durable Medical Equipment market.
>
> Second, it may do so by showing that the unlawful competitive advantage or injury to competitors in the Durable Medical Equipment market was the necessary and direct consequence of defendant Venice Hospital's conduct or business arrangements.

In effect, the jury was charged on attempted monopolization. *See Catlin*, 791 F.2d at 1349. The only element arguably missing from this charge is the requisite specific intent to monopolize required under traditional Section 2 attempt claims. We need not now decide whether this would be fatal to plaintiff's monopoly leveraging claim since under the count for conspiracy to monopolize, the jury found that Venice Hospital had specific intent to monopolize the DME market. All the other elements of an attempt to monopolize under Section 2 are present in this case. The key to

distinguishing unlawful monopoly leveraging from lawful competitive advantage available as a result of integration is intent. There is ample evidence—other than the mere fact that Venice Hospital through the joint venture expanded into a related field—which shows that this tack was taken with the unlawful intent to monopolize the DME market. In a different context, nevertheless applicable here, the Supreme Court held that "[i]n the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right" of a party to deal with whomever he chooses. *Lorain Journal*, 72 S.Ct. at 187. The Court observed that "[t]he right claimed by the publisher is neither absolute nor exempt from regulation. Its exercise as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act." *Id.* So it is here. Generally speaking a party with a lawful monopoly may reap the benefits of its size and an integrated firm may reap the benefits of that integration. However, when a party with monopoly power abuses its monopoly power in one market as a means of gaining an unlawful competitive advantage in and monopolizing another market, we have no hesitation to conclude that the Sherman Act prohibits such conduct. *See Otter Tail Power*, 93 S.Ct. at 1029 ("Use of monopoly power to destroy threatened competition is a violation of the attempt to monopolize clause of § 2 of the Sherman Act."). We conclude therefore that there is ample evidence which supports the jury's finding that Venice Hospital engaged in unlawful monopoly leveraging.

### III. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS:

The jury found that defendants MPAC and Venice Hospital tortiously interfered with VCA's business relationship with the home health care nurses. The Supreme Court of Florida has stated that to succeed on a tortious interference claim, a plaintiff must show four elements:

(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.

*Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla.1985). The judge's charge to the jury satisfies these elements and appellees do not contest the charge. The district court rejected the jury's finding solely on the ground that the evidence did not support a finding under the third element, i.e., that the defendants' conduct was not unjustified. Having found above that the defendants' conduct violated the antitrust laws, we have no difficulty concluding that the defendants' conduct was also unjustified. Appellees argue that the evidence does not support the jury's finding that the interference was intentional because the defendants did not know the home health care nurses were predominantly recommending VCA. We find this argument meritless. Nothing in our review of the Florida cases indicates that the defendant needed to know specifically who its acts would injure. In fact, the Florida Standard Jury Instruction for this tort states in part that "[i]nterference is intentional if the person interfering ... knows that the interference is substantially certain to occur as a result of his action." *McCurdy v. Collis*, 508 So.2d 380, 383 n. 2 (Fla.App. 1 Dist.1987). The defendants were well aware of the relationships between the home health care nurses and the competing DME vendors. It was because of those relationships which sent business to MPAC's competitors that the defendants sought to unduly influence the nurses preferentially to recommend MPAC. We conclude that the evidence supports the jury's finding that the named defendants tortiously interfered with VCA's business relations.

### CONCLUSION

For the foregoing reasons, the decision of the district court is REVERSED, the case is REMANDED to the district court with directions to reinstate the jury verdict

on special interrogatories I, III, IV, V and VI.