NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0546n.06
Filed: August 7, 2007

No. 06-3819

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| SUNDAR V. NILAVAR, M.D., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| MERCY HEALTH SYSTEM-WESTERN | ) | SOUTHERN DISTRICT OF OHIO |
| OHIO, CATHOLIC HEALTHCARE | ) | |
| PARTNERS, MICHAEL J. PETERSON, | ) | |
| JEROLD A. MAKI, DR. ROBIN OSBORN, | | |
| and DIAGNOSTIC IMAGING ON OHIO, | | |
| INC., | | |
| | | |
| Defendants-Appellees. | | |

**Before:** **COLE and McKEAGUE, Circuit Judges; and COHN, District Judge.**[*]

**AVERN COHN, District Judge**. This is purported to be an antitrust case. Plaintiff-Appellant

Dr. Sundar V. Nilavar sued defendant-appellees Mercy Health System-Western Ohio ("MHS"),

Catholic Healthcare Partners, Michael J. Peterson, Jerold A. Maki, Dr. Robin Osborn, and

Diagnostic Imaging of Ohio, Inc. ("DIA")[1] (collectively, "defendants"), asserting claims under

state and federal antitrust law as well as related state tort claims. Plaintiff appeals from the

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1]Plaintiff's claims against Dr. Osborn and DIA were dismissed and are not at issue on appeal.

district court's orders granting defendants' motion for summary judgment and motion to exclude plaintiff's expert's testimony, and from the denial of plaintiff's motion for reconsideration regarding the same. As will be explained, plaintiff challenges only the dismissal of his antitrust claims. For the reasons that follow, we affirm.

**I.**

Plaintiff, a radiologist who last practiced medicine in 1995, sued defendants, claiming injuries resulting from a decision by MHS to enter into an exclusive contract for radiology services with Dr. Robin Osborn and his medical corporation, DRI, to provide radiology services at the two hospitals MHS operates in Springfield and Urbana, Ohio (the "Mercy Hospitals").[2] For some years prior to 1995, plaintiff practiced radiology as part of a member of a practice group, Springfield Radiology, Inc. ("SRI"), of which Dr. Osborn was also a member. SRI served Mercy Hospitals in providing radiology services, although not under a formal exclusive relationship. Dr. Osborn left SRI sometime in early 1995 and formed DIA. In March 1995, MHS issued a Request for Proposal ("RFP") for exclusive physician radiology services at the Mercy Hospitals. Three physician groups responded to the RFP, including DIA. On September 2, 1995, plaintiff learned that DIA would be awarded the contract and that he had not been included in the DIA proposal. By September 22, 1995, plaintiff experienced severe depression which prevented him from working.

DIA was awarded the contract in December of 1995, effective January 1, 1996. As a

---

[2]Defendant Catholic Healthcare Partners is the corporate parent of MHS, and the two individual defendants, Michael Peterson and Jerold Maki, are officers of MHS.

result, MHS notified plaintiff that his clinical privileges would be terminated with MHS as of January 1, 1996. Plaintiff, however, retained privileges at Springfield Community Hospital, but declined an offer to work there due to his ongoing depression.

In 1996, plaintiff sued Dr. Osborn and DIA in state court, claiming breach of contract, estoppel, breach of fiduciary duty, and fraud arising out of Dr. Osborn's failure to negotiate the exclusive contract with MHS on his behalf. As part of the state case, plaintiff admitted that he has been unable to practice medicine as of September 22, 1995, because of severe depression resulting from Dr. Osborn's actions. Plaintiff obtained a $100,000.00 jury verdict against Dr. Osborn. The Ohio appellate court upheld the judgment, but remanded for a new trial on damages. The case was settled on remand.

On November 19, 1999, plaintiff sued defendants in federal court, making eight claims, as follows: (1) contract in restraint of trade, in violation of section 1 of the Sherman Act; (2) tying arrangement in restraint of trade, in violation of section 1 of the Sherman Act; (3) contract and tying arrangement in restraint of trade, in violation of Ohio's Valentine [Antitrust] Act; (4) a state law claim of tortious interference with a business relationship; (5) a state law claim of breach of implied covenant of good faith and fair dealing; (6) a state law claim of civil conspiracy; (7) a state law claim of denial of due process; and (8) a state law claim of breach of contract. Defendants filed a motion to dismiss, which the district court granted in part and denied in part. The district court dismissed Counts Two and Five, and parts of Counts Three and Six. *Nilavar v. Mercy Health Sys.-W. Ohio*, 142 F. Supp. 2d 859, 880–90, 894 (S.D. Ohio 2000). The district court later entered a stipulation dismissing all remaining claims against Dr. Osborn

3

and DIA.  Plaintiff then added a ninth claim for intentional infliction of emotional distress.

Defendants then filed a motion for summary judgment based primarily on judicial estoppel as a

result of plaintiff's statements in the state court case.  The district court denied the motion.

*Nilavar v. Mercy Health Sys.-W. Ohio*, 254 F. Supp. 2d 897, 911 (S.D. Ohio 2003).

Defendants filed a second motion for summary judgment on all of plaintiff's claims

except Count Nine, which was added after their motion was filed.  On the date of defendants'

filing, plaintiff dismissed his state and federal antitrust claims based on illegal tying.  Thus, only

his state and federal antitrust claims relating to the exclusive contract remained.  Defendants also

filed a motion to bar the testimony of plaintiff's economics expert, Dr. John Pisarkiewicz.

The district court granted defendants' motions.  As to the motion to strike the expert, the

district court found that the expert's methodology for determining a relevant "geographic

market" was unreliable.  As to the motion for summary judgment, the district court found that

plaintiff's claims failed as a result of his failure to have expert testimony on the geographic

market and on the grounds that he could not show an antitrust injury because the contract at issue

was a mere "reshuffling of competitors" and the exclusive contract was of such short duration

that it could not restrain trade.  The district court also asked the parties to address the viability of

Count Nine (intentional infliction of emotional distress).

Plaintiff filed a motion for reconsideration.  Defendants filed a motion for summary

judgment on Count Nine.   The district court denied plaintiff's motion and granted defendants'

motion.  A final judgment was entered.  Plaintiff appeals, challenging the dismissal of his

antitrust claims and exclusion of his expert's testimony.

Plaintiff's antitrust theory is that defendants excluded plaintiff and other radiology providers from the Mercy Hospitals by granting an exclusive contract to DIA to supply radiology services and that DIA complied with MHS's "cost-cutting interests" by utilizing "dangerous and less expensive contrast agents," which resulted in higher prices and reduced quality of radiology services at the Mercy Hospitals that dominated the Springfield-Urbana area of Southwestern Ohio.

## II.

### A.

We review the district court's order granting summary judgment de novo. *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 619 (6th Cir. 1999). We "must consider all the facts in the light most favorable to the nonmovant and must give the nonmovant the benefit of every reasonable inference." *Id.* The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. *Sims v. Memphis Processors, Inc.*, 926 F.2d 524, 526 (6th Cir. 1991) (quoting *Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986)). Importantly, we have observed that a movant's summary judgment burden is not altered by virtue of the fact that the case involves an antitrust claim. *See Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 930–31 (6th Cir. 2005).

We review the district court's decision to exclude expert testimony for an abuse of discretion. *Barnes v. Kerr Corp.*, 418 F.3d 583, 588 (6th Cir. 2005).

**B.**

Plaintiff argues that the district court misconstrued the facts and misapplied the law regarding antitrust actions. Plaintiff says he presented evidence of actual harm resulting from the exclusive contract and therefore expert testimony on the relevant geographic market was not necessary. Plaintiff alternatively argues that his expert's methodology was reliable and should not have been excluded. He further argues there are genuine issues of material fact as to whether he suffered an antitrust injury and whether the exclusive contract was anticompetitve.

Defendants argue that there is no evidence of an antitrust injury and that exclusive contracts, such as the one at issue, are commonplace in the medical field and do not violate the antitrust laws. Defendants further argue that plaintiff's expert's ever-changing reports demonstrate the flaws in his methodology in determining the relevant market.

**C.**

Plaintiff claims that defendants' exclusive contract for radiology services with DIA violates section 1 of the Sherman Act and Ohio's Valentine Act, chapter 1331 of the Ohio Revised Code.[3] Section 1 states, in relevant part: "Every contract, combination . . . or

---

[3]The Valentine Act was modeled after the Sherman Act and federal law applies to its interpretation. *See C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St. 2d 201, 204 (1980).

conspiracy, in restraint of trade or commerce among the several States, . . . is declared to be illegal." 15 U.S.C. § 1. Read "literally," section 1 "prohibits *every* agreement in restraint of trade." *Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 342 (1982) (internal quotation marks omitted). However, the Supreme Court has long recognized that Congress intended to outlaw only "unreasonable" restraints. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997); *Maricopa County*, 457 U.S. at 342–43 (citing *United States v. Joint-Traffic Ass'n*, 171 U.S. 505, 572 (1898), for the proposition that Congress does not always intend a literal interpretation of the word "every").

We have stated:

> to establish a claim under section 1, the plaintiff must establish that the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy.

*Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988) (internal quotation marks omitted) (quoting *Davis-Watkins Co. v. Serv. Merch.*, 686 F.2d 1190, 1195–96 (6th Cir. 1982), *overruled in part by Bailey's, Inc. v. Windsor Am., Inc.*, 948 F.3d 1018, 1029 n.5 (6th Cir. 1991)).

As noted above, the district court granted summary judgment to defendants on the grounds that plaintiff (1) failed to show sufficient evidence of anti-competitive conduct, including defining the relevant geographic market, (2) failed to establish a genuine issue of material fact as to antitrust injury, and (3) failed to show that the exclusive contract restrained trade. The first ground overlays the district court's decision regarding the exclusion of plaintiff's

proposed expert. Each ground is discussed in turn.

**1.**

As to whether plaintiff produced sufficient evidence of anticompetitive conduct, "[t]wo analytical approaches are used to determine whether a defendant's conduct unreasonably restrains trade: the *per se* rule and the rule of reason." *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1016 (10th Cir. 1998) (citing *S.C.F.C. I.L.C., Inc. v. Visa U.S.A., Inc.*, 36 F.3d 958, 963 (10th Cir. 1994)). The district court previously determined that the rule of reason applied. *See Nilavar*, 142 F. Supp. 2d at 873–74.

"The rule of reason . . . requires a court to analyze the history of the restraint and the restraint's effect on competition." *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003). "The rule of reason analysis employs a burden-shifting framework." *Id.* (citing *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 775 n.12 (1999)). First, the plaintiff must establish that the restraint produces significant anticompetitive effects within the relevant product and geographic markets. *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001). This is usually shown through the use of expert testimony regarding the geographic market and a defendant's market power. "If the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects" to establish that the alleged conduct justifies the otherwise anticompetitive injuries. *Id.*; *see also United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993). If the defendant is able to demonstrate procompetitive effects, the plaintiff then must show that any legitimate objectives

8

can be achieved in a substantially less restrictive manner. *Law*, 134 F.3d at 1019.

However, the Supreme Court has found that if there is demonstrable evidence that the challenged restraint is unreasonable, then there is significant evidence of competitive harm, and therefore there is no need to resort to tools such as expert testimony to define the geographic market and determination of market power. The rationale is that market power is simply a surrogate for actual detrimental effects. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458–61 (1986).

**a.**

When faced with the exclusion of his expert, plaintiff argued in his motion for reconsideration that the expert's testimony was not necessary because the record contained significant evidence of competitive harm. The district court rejected this argument. Plaintiff points to the same evidence considered by the district court, contending that it raises a genuine issue of material fact as to whether actual detrimental effects flowed from the exclusive contract between MHS and DIA. We agree with the district court that none of plaintiff's evidence rises to the level of significant competitive harm.

First, plaintiff points to the fact that under the exclusive contract, defendants were able to use less expensive ionic contrast agents in radiology procedures, a practice which plaintiff has long opposed. While plaintiff says the use of ionic, instead of non-ionic, contrast agents is dangerous, there is no evidence that any patient at MHS suffered as a result of the use of ionic contrast agents. Plaintiff also admitted at deposition that the ionic debate was a non-issue by

9

February 1995. Thus, this is not evidence of an actual detrimental effect on competition or consumers.

Plaintiff also points to the fact that the contract permits the use of temporary or part-time physicians and that Dr. Osborn doubled his income under the contract. However, plaintiff has no evidence that any patients suffered as a result. There is also no evidence that any of the temporary or part-time physicians were unqualified.

In short, the record does not contain sufficient evidence of detrimental effects that would obviate the need for plaintiff to identify the relevant geographic market and market power in order to determine whether the exclusive contract violates section 1 of the Sherman Act.

**b.**

**(1)**

Whether plaintiff established sufficient evidence of a geographic market so as to show an antitrust violation centers on whether the district court erred in excluding plaintiff's proposed expert's testimony.

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

10

Fed. R. Evid. 702.  This rule reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  In *Daubert*, the Supreme Court provided a nonexhaustive list of factors which may, in any given case, bear on a trial judge's gatekeeping determination.  509 U.S. at 592–94.  These factors include: (1) whether a "theory or technique . . . can be (and has been) tested," (2) whether the theory "has been subjected to peer review and publication;" (3) whether, with respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."  *Id.*  Six years after issuing *Daubert*, the Court made clear in *Kumho* that these same factors apply to all types of expert testimony.  526 U.S. at 148–49.

**(2)**

The district court determined that although plaintiff's proposed expert, John Pisarkiewicz, Ph.D., could opine as to the relevant product market, his proffered testimony with respect to the proposed geographic market was inadmissible under Rule 702.  The district court found two flaws in the expert's analysis:  (1) adjustments made by the expert to his analysis contradicted his proposed product market definition, which resulted in his opinion being based on unreliable methods; and (2) the adjustments made were incorrect as a matter of law.

Plaintiff offered the following definition of the relevant geographic market:  "the physician component of diagnostic radiology services provided in [a] . . . hospital setting" with a

11

relevant submarket consisting of "the physician component of diagnostic radiology services provided to inpatients." As to the locale, plaintiff defined it as "essentially comprising Clark and Champaign Counties," consisting of an area encompassed by nineteen ZIP codes. The expert explained that his primary tools for opining that defendants exercise market power in that geographic area were the Elzinga-Hogarty test and the critical loss test. Defendants argued, as they do here, that the expert's opinion is unreliable because he manipulated those tests to arrive at a conclusion favorable to plaintiff. The district court agreed. We also agree.

**(3)**

The Elzinga-Hogarty test analyzes patterns of consumer origin and destination to identify relevant competitors of the contracting entities. *See FTC v. Freeman Hosp.*, 69 F.3d 260, 264 (8th Cir. 1995). In other words, the test measures the extent to which a product comes into (in-flow) and leaves (out-flow) the market. In-flow and out-flow are represented by the two variables of the test, LOFI (little out from inside) and LIFO (little in from outside), which are expressed in percentages. In order to show actions which indicate market power having an adverse effect on competition, a plaintiff would need to show that the in-flow and out-flow are low. Here, plaintiff would have to show that few residents of his geographic market leave the area to obtain hospital-based radiological services (LOFI) and that few patients residing outside of the geographic market come to the area to obtain hospital based radiological services (LIFO). Low scores would demonstrate the existence of a cohesive geographic market and show defendants' market power. Courts that have used the Elzinga-Hogarty test in antitrust cases have found that a 10% threshold is needed for a strong result. *See Gordon v. Lewistown Hosp.*, 272 F.

12

Supp. 2d 393, 426 (M.D. Pa. 2003). That is, a geographic market is properly defined when 10% or less of the consumers leave the area to obtain the product and when 10% or less of consumers who obtain the product come in from outside the area. *Id*.

In the expert's initial report, he found a LIFO ratio of 4.8% and a LOFI of 25.0%. While the test says that 25% is a weak result, the expert described it as "good." He also suggested that the results could be strengthened by using individual ZIP codes rather than county borders. Indeed, at his deposition, the expert supplemented his report by removing from consideration ZIP codes in the southwest corner of Clark County and the northeast corner of Champaign County. This caused his out-flow to drop to 16% and in-flow to increase to 11%. Following his deposition, the expert further refined his analysis under the Elzinga-Hogarty test in an affidavit. In the affidavit, he states that after further refinement, the average LOFI and LIFO ratios are 8.7%, or within the 10% generally called for by the test.

As explained by the district court, these refinements fundamentally altered the results of the test, rendering them unreliable. The first problem is that the expert excluded patients from the geographic market who required a procedure for which more than 90% of them left the market. The district court found that such exclusion was improper as a matter of law. We agree. This Circuit has held that "when the evidence indicates that a large proportion of consumers within the proposed area in fact turn to alternative sources of supply outside the proposed area, the market boundaries posited by the plaintiff must be rejected." *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1017 (6th Cir. 1999) (citing *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 346 (8th Cir. 1995)).

13

The district court further noted that the expert's admission that some of the patients who left the area for services, whom he specifically excluded, did so not because the services they required were not available at one of the three hospitals, but because the services were perceived to be better elsewhere. This fact alone shows the presence of competition in the market. The expert also excluded patients who left the area to visit specialty hospitals or out-of-state hospitals or who required obstetrics and newborn care services. There is simply no proper justification for all of these exclusions. These exclusions also indicate the presence of competition, as patients are able to leave the geographic market to obtain services, which presumably are available in the market, where they desire. At best, the exclusion show an improper application of the Elzinga-Hogarty test. At worst, they show an effort to manipulate the test. The district court was correct in excluding the expert's report on this ground.

**(4)**

The expert also justified his conclusions using the critical loss test. This test is from the Federal Trade Commission's Horizontal Merger Guidelines. It assesses whether a market participant would be able to raise prices without causing a "critical loss" of consumers that would make the price increase ultimately unprofitable. *See Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 198 (1st Cir. 1996) ("The touchstone of market definition is whether a hypothetical monopolist could raise prices."). The price increase recommended by the Merger Guidelines is 5%. As applied to this case, the test would ask how many patients would have to leave the market in order to defeat a price increase by defendants of 5% and whether those patients actually would leave the market. Defendants argue that the expert

14

erred in using "gross charges" for inpatient and outpatient radiological services when calculating the critical loss figure, rather than actual charges. The district court bypassed this criticism, noting a more fundamental flaw with utilization of the critical loss test—the fact that patients were leaving the geographic area in the absence of any price increase. As noted above, the expert's initial conclusion was that 25% of patients within the geographic market were leaving the area to obtain radiology services elsewhere. Because some patients were already leaving, it makes no logical sense that these same patients would not also leave if prices increased. In an attempt to rationalize this fact, the expert claimed that the patients who were leaving were obtaining radiology services that were unavailable in the geographic market. This statement, if true, contradicts the defined product market, which is "all diagnostic radiology services provided in a hospital setting." This definition does not distinguish between the type of services (other than inpatient or outpatient) provided. Thus, the district court did not err in finding the expert's report inadmissible on this ground.

### (5)

Overall, the expert's opinion, whether based on the Elzinga-Hogarty test or the critical loss test, is flawed to the point of unreliability. While the tests themselves are appropriate and within the parameters of *Daubert*, the way in which the expert applied the tests undercuts his opinion to the point that it is inadmissible under Rule 702.

### 2.

The district court also determined, alternatively, that plaintiff's antitrust claim failed

because he did not establish an antitrust injury. A private antitrust plaintiff, in addition to having to show injury-in-fact and proximate cause, must allege, and eventually prove, "antitrust injury." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "Antitrust injury" is (1) "injury of the type the antitrust laws were intended to prevent" and (2) injury "that flows from that which makes defendants' acts unlawful." *Id*. As explained by the Supreme Court in *Brunswick*, the antitrust injury doctrine is designed to ensure that "[t]he injury . . . reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* The Supreme Court has further explained the requirement as "ensur[ing] that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place," and, more specifically, it "ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. U.S.A. Petroleum Co.*, 495 U.S. 328, 342–44 (1990).

The district court, relying on *Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994), held that plaintiff failed to establish an antitrust injury because the exclusive contract between defendants and DIA was the result of competition between radiology providers. The facts in *Balaklaw* are similar to the instant case. In *Balaklaw*, a physician who was president of a group of anesthesiologists that had been the de facto provider of anesthesiology services at a hospital in Cortland, New York, sued claiming an antitrust violation after his group lost in the competition to be granted an exclusive-provider contract at that hospital. The Court of Appeals for the Second Circuit held that plaintiff had not suffered an antitrust injury under the circumstances. The Second Circuit explained:

16

"[I]t is the nature of competition that at some point there are winners and losers, and the losers are excluded." *Konik v. Champlain Valley Physicians Hosp. Med. Ctr.*, 733 F.2d 1007, 1015 (2d Cir.), *cert. denied*, 469 U.S. 884 (1984). Here, Dr. Balaklaw entered the competition for an exclusive contract, he interviewed for it, and he lost. He was therefore excluded from further practice at CMH during the term of the contract. Especially in light of the Supreme Court's recognition that a hospital has the "unquestioned right to exercise some control over the identity and the number of doctors to whom it accords staff privileges," *Jefferson Parish*, 466 U.S. at 30, and the frequently expressed judicial approval of exclusive contracts for medical services, . . . such exclusion is not enough to constitute an antitrust injury. As we said in *Konik*, "the Hospital is not required to open its operating rooms to any and all anesthesiologists who wish to practice there." 733 F.2d at 1015. By closing it doors to Dr. Balaklaw in favor of one of his competitors, CMH did nothing to inflict an injury of the type the antitrust laws were intended to prevent.

*Balaklaw*, 14 F.3d at 801–02 (internal citations omitted).

A careful examination of the evidence shows that the exclusive contract was truly the result of a competitive process. Although plaintiff says that the process was not competitive because Dr. Osborn "duped" the members of SRI into believing that he was submitting a proposal on behalf of SRI and colluded with members of Mercy to assure that DIA was awarded the contract, plaintiff admits that there were other bidders for the contract. Plaintiff offers no evidence to support his allegations, which are based solely on speculation. The facts show that SRI was the de facto exclusive provider of radiology services to Mercy for a number of years. Mercy and SRI negotiated, unsuccessfully, to establish an exclusive contractual relationship. Mercy thereafter decided to solicit proposals for an exclusive contract. RFPs were sent to seven radiology groups, including SRI. Three groups submitted proposals. MHS appointed a committee to review the proposals, and the committee recommended DIA. One marketplace participant replaced another; that does not establish an antitrust violation. The fact that an Ohio state court jury found that Dr. Osborn breached an agreement with plaintiff by not including his name in the DIA proposal, of which there is no evidence MHS had knowledge, does not mean

17

that the overall process was anticompetitive.

Plaintiff also says that the process was anticompetitive in that the exclusive contract resulted in a significant reduction in physician radiology services because physicians, including plaintiff, lost their privileges after the contract was adopted. However, a loss of staff privileges at a facility does not ispo facto establish an antitrust injury. *See Oksanen v. Page Mem'l. Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991) ("If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action.").

Moreover, it cannot be ignored that this case involves a staffing decision by MHS regarding the provider of radiology services. There is extensive circuit precedent, including our own, that has upheld hospital-based exclusive provider agreements as not violative of the antitrust laws. Although the reasons vary for the decisions, they offer support for the finding that a hospital's decision regarding staffing, including privileges, is not anticompetitive. *See, e.g.*, *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682 (8th Cir. 1993) (osteopaths denied privileges because they lacked certification from a particular organization); *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537 (2d Cir. 1993) (radiologists challenging exclusive contract); *Lie v. St. Joseph Hosp.*, 964 F.2d 567 (6th Cir. 1992) (physician's surgical privileges were suspended); *Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558 (10th Cir. 1991) (physician opened up a treatment center and hospital greatly reduced his privileges); *Oksanen*, 945 F.2d at 696 (physician suspended, put on probation and then terminated); *Bhan v. N.M.E. Hosp.*, 929 F.2d 1404 (9th Cir. 1991) (anesthetist was excluded by policy of allowing only physicians to perform anesthesia services); *Todorov v. D.C.H. Healthcare Auth.*, 921 F.2d 1438

18

(11th Cir. 1991) (physician denied radiology privileges); *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484 (9th Cir. 1991) (radiologists challenging exclusive contract); *Nurse Midwifery Assocs. v. Hibbett*, 918 F.2d 605 (6th Cir. 1990) (midwives and obstetrician allege they were prevented from operating a maternity practice or offering midwifery services at hospitals); *Beard v. Parkview Hosp.*, 912 F.2d 138 (6th Cir. 1990) (radiologist challenging exclusive contract); *Ezpeleta v. Sisters of Mercy Health Corp.*, 800 F.2d 119 (7th Cir. 1986) (anesthesiologist's privileges terminated); *Goss v. Mem. Hosp. Sys.*, 789 F.2d 353 (5th Cir. 1986) (physician's privileges terminated); *Konik v. Champlain Valley Physicians Hosp.*, 733 F.2d 1007 (2d Cir. 1984) (anesthesiologist challenging contract); *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346 (7th Cir. 1982) (vacating preliminary injunction that was decided in favor of anesthesiologist who was challenging exclusive contract).

**3.**

Finally, plaintiff contends that whether the contract restrained trade is a factual dispute over which there are genuine issues. We disagree. The contract was entered into in 1995 and nominally effective for only two years. The district court initially declined to dismiss plaintiff's antitrust claim on these grounds, noting that plaintiff alleged the evidence may show that the opportunity to compete in two years was illusory. After having the benefit of discovery, plaintiff's allegation as to the contract's illusory nature simply did not come to pass.

**4.**

Defendants also argue that the district court may be affirmed on other grounds, including

19

the statute of limitations and lack of antitrust standing. Both arguments were presented to and rejected by the district court. *See Nilavar*, 142 F. Supp. 2d at 859. Defendants did not cross appeal from these rulings; we therefore need not address them. Defendants also offer additional grounds for excluding the opinion of plaintiff's expert. We decline to address them.

## III.

For the reasons stated above, the district court is AFFIRMED.