**AVX CORPORATION**
**and AVX Limited**

v.

**CABOT CORPORATION.**

**Civil Action No. 04–10467–RGS.**

United States District Court,
D. Massachusetts.

March 5, 2009.

Tish L. Berard, Hearts on Fire Company, LLC, Joseph S. Bodoff, Richard A. Goren, Richard P. O'Neil, Ryan D. Sullivan, Bodoff & Associates, P.C., Boston, MA, for Plaintiffs.

Brian A. Davis, Robert S. Frank, Jr., Julie C. Rising, Choate, Hall & Stewart, Terrence Michael, Schwab Tarlow, Breed, Hart & Rodgers PC, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

This case will (hopefully) bring down the final curtain in this long-running lawsuit brought by plaintiffs AVX Corporation and AVX Limited (collectively AVX) against defendant Cabot Corporation (Cabot). The case arose out of a five-year agreement (the Supply Agreement) that committed AVX to purchase minimum quantities of "flake" and "non-flake" (or "nodular") tantalum powders from Cabot.[1] The Supply Agreement expired on December 31, 2005.

Over the years, AVX has sought to prosecute its claims in both the state and federal courts without great success. *See, e.g., Cabot Corp. v. AVX Corp.,* 448 Mass. 629, 863 N.E.2d 503 (2007); *AVX Corp. v. Cabot Corp.,* 424 F.3d 28 (1st Cir.2005). All but one of AVX's claims have been pruned or weeded out over time by state and federal decisions. Cabot now moves for entry of summary judgment on AVX's remaining claim, which alleges a violation by Cabot of the "anti-tying" prohibition of the Sherman Act, 15 U.S.C. §§ 1 and 14. AVX, for its part, moves for partial summary judgment, contending that three of the four elements of its tying claim are undisputed.

To sum up Cabot's arguments: Cabot contends that AVX's last, best, and only chance has less to do with the antitrust laws than with buyer's remorse. From Cabot's perspective, AVX entered after arms-length negotiations into a long-term contract for the purchase of tantalum, a contract which over time lost its lustre when the market price for tantalum declined (contrary to AVX's expectations). According to Cabot, AVX is trying to win back in court what it lost fairly at the bargaining table. Additionally, Cabot contends that AVX is unable to show that anything Cabot did caused an "injury in [AVX's] business or property (in an antitrust sense)." *See Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors,* 850 F.2d 803, 815 (1st Cir.1988). Accordingly, Cabot moves for summary judgment.

To understand AVX's cross-motion: One must begin with the elements of a "tying" claim. "Section 1 of the Sherman Act prohibits a seller from 'tying' the sale of one product to the purchase of a second product if the seller thereby avoids competition on the merits of the 'tied' product." *See Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo, Inc.,* 96 F.3d 10, 17 (1st Cir.1996).

1. Tantalum is a rare, very hard, and highly corrosion-resistant metal. It occurs naturally in the mineral tantalite. The chemical inertness of tantalum makes it a valuable substance for laboratory equipment. It is almost completely immune from chemical attack at temperatures below 150°C, and is permeable only by hydrofluoric acid, acidic solutions containing the fluoride ion, and free sulphur trioxide. The element has a melting point exceeded only by tungsten and rhenium. Tantalum's main use is in the manufacture of electrolytic capacitors.

[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*Id.*, quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). On the other hand, "[t]here is no tie for any antitrust purpose unless the defendant improperly imposes conditions that explicitly or practically require buyers to take the second product if they want the first one." 10 Phillip E. Areeda et al., *Antitrust Law* ¶ 1752b, at 280 (1996).

The United States Supreme Court had historically employed a per se test in antitrust cases, under which certain species of contract in restraint of trade were deemed unreasonable as a matter of law, among them tying arrangements. *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1178 (1st Cir.1994). In *Illinois Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006), however, the Supreme Court largely eviscerated the per se test by overruling the longstanding presumption that a patent confers market power on a patentee that renders any "tying" of a secondary product with the patented product a per se antitrust violation. In a unanimous opinion by Justice Stevens, the Court held that

a valid patent notwithstanding, a plaintiff must prove market power as an affirmative element of its case. In rejecting any presumption of market power, Justice Stevens expressed skepticism about the durability of the anti-tying rule itself, observing that the Court's "strong [historical] disapproval of tying arrangements has substantially diminished." *Id.* at 35, 126 S.Ct. 1281.[2] *See Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 593–594 (7th Cir.2008) (noting that the Supreme Court has not discarded the tying rule but has modified it to require proof that the seller has power in the market for the tying product); Rachel Krevans & Daniel P. Muino, *Restoring the Balance: The Supreme Court Joins the Patent Reform Movement,* 9 Sedona Conf. J. 15 (Fall 2008) (characterizing the *Illinois Tool Works* decision as being influenced by the "congressional judgment reflected in the 1988 amendment [to the patent code]" that "tying arrangements involving patented products should not be deemed per se antitrust violations . . ."). *See also* Gabriel Feldman, *The Misuse of the Less Restrictive Alternative Inquiry in the Rule of Reason Analysis*, 58 Am. U. L. Rev. 561, 578 (2009) ("The per se test is applied with less rigidity in tying cases, as proof of the tying agreement leads only to a rebuttable presumption of illegality.").

■ To prove a tying claim, a plaintiff must produce evidence establishing each of four elements: "(1) the tying and the tied products [here Cabot's nodular and flake tantalum powders] are actually two distinct products;[3] (2) there is an agreement or condition, express or implied, that

---

2. The skepticism is echoed in the academic literature. *See* William E. Kovacic, *The Intellectual DNA of Modern U.S. Competition Law for Dominant Firm Conduct: The Chicago/Harvard Double Helix*, 2007 Colum. Bus. L. Rev. 1, 35; William E. Kovacic, *The Antitrust Paradox Revisited: Robert Bork and the Trans-*

*formation of Modern Antitrust Policy,* 36 Wayne L. Rev. 1413, 1437–1439, 1445–1451 (1990)

3. Under doctrine developed by the Supreme Court in *Jefferson Parish*, the question whether products are distinct turns not on their

constitutes a tying; (3) the entity accused of tying [Cabot] has such economic power in the relevant market over supply of the tying product to distort consumers' choices with respect to the tied product; [4] and (4) the tie forecloses a substantial amount of commerce in the market for the tied product." *Data Gen. Corp.*, 36 F.3d at 1178–1179. With respect to the first, third, and fourth elements, AVX contends that it is undisputed that flake tantalum powder and non-flake (nodular) tantalum powder are "distinct products"; that Cabot in 2001 had dominant "market power" over flake tantalum powder and used its position to tie or "condition AVX's purchase of the flake powders on its purchase of non-flake [tantalum] powders"; and that the tie affected "a substantial amount of commerce." AVX asks the court to enter judgment as a matter of law with respect to these elements of its Sherman Act claim. Complaint ¶¶ 1, 33–41.

## DISCUSSION

Though facts are to be viewed in the light most favorable to the non-moving party, it is incumbent on the nonmovant to present specific facts to show that there is a genuine issue for trial. It is not enough to "rest on mere allegations" in opposing a properly supported motion for summary judgment. *See Borschow*, 96 F.3d at 14 (approving a grant of summary judgment in a tying case). "Whether a plaintiff's

alleged facts comprise a per se claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss or for summary judgment." *See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir.2004), citing *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 50–51 (1st Cir.1998).

The court will begin with Cabot's arguments as they are dispositive. Cabot contends that AVX has produced no evidence that Cabot coercively tied AVX's purchases of flake tantalum powder to the purchase of non-flake or nodular tantalum powder. Cabot argues that AVX has shown no more than: (1) that AVX was in the market for all types of tantalum powder; and (2) that Cabot would only sell tantalum products (separately or collectively) pursuant to multi-year contracts. When AVX's Rule 30(b)(6) deponent, Vice-President of Worldwide Tantalum Products Peter Collis, was asked to explain the thrust of AVX's Complaint, he replied that Cabot had "coerced" AVX into signing a binding, multi-year tantalum purchase contract instead of the shorter-term contract that had been contemplated in the parties' "letters of intent." [5] Cabot for its part contends that during the contract negotiations, "AVX consistently pressed for the opportunity to purchase *more* nodular powder, *more* flake powder, and *more* KTaF." [6] Cabot's Memorandum in Support

---

functional relation, but rather on the nature of the demand in the market. In *Times–Picayune Publ'g Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), the Court held that advertising space in a morning newspaper was the same product as advertising space in the evening edition of the same newspaper as advertisers had no reason to distinguish between morning and afternoon readers. By contrast, in *Eastman Kodak Co. v. Image Tech. Serv. Inc.*, 504 U.S. 451, 462, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), the Court observed that servicing and related parts can constitute distinct products

if there is "sufficient consumer demand so that it is efficient for a firm to provide them separately."

4. Market power is the power "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish*, 466 U.S. at 14, 104 S.Ct. 1551.

5. *See* Collis Dep. at 27–28 (set out *infra*).

6. KTaF is the industry's name for semi-refined tantalum ore. AVX alleges that KTaF is one of the "tied" products in this case. *See* AVX Statement of Facts (SOF) ¶¶ 7, 21 and

of Summary Judgment at 3 (emphasis in original).

> AVX's President and Chief Executive Officer, who was directly involved in the negotiation of the Supply Agreement in the summer and fall of 2000, has testified under oath that AVX actually desired to purchase more, not less, nodular powder from Cabot at the time the parties entered into that Agreement, and AVX's desire for more nodular powder is confirmed in the Agreement itself; and regardless of the true nature of its claim in this action, AVX cannot prove that it suffered actual injury as a result of Cabot's purported violation of federal antitrust laws. In fact, AVX has produced no evidence that it suffered any harm whatsoever on account of Cabot's alleged misconduct.

Cabot's Opposition to AVX's Motion for Partial Summary Judgment at 6.[7] Cabot argues that on the undisputed facts, the parties' negotiation of a long-term purchase of products cannot constitute a per se tying arrangement as a matter of law.[8]

In response, AVX maintains that to defeat Cabot's motion, all it need show

> is an act of conditioning the purchase of one product on the purchase of another, not whether the plaintiff is coerced into buying the product or whether it wanted the product. The focus of an illegal tie is on actions of the defendant and the consequent harm to competition, not the harm to the plaintiff itself. As this

Court so aptly stated in its earlier decision in this case:

> A "victim" of an illegal tying arrangement might well be a perfectly willing participant in the transaction, either because it prizes the tying product highly, or because it has a concomitant desire to acquire the tied product. It is the harm to competition that the antitrust laws seek to avert—not harms to individual market participants.

This point is only confirmed by the cases that hold that even if the buyer is totally indifferent among brands of the second product and therefore loses nothing by agreeing to use the seller's brand of the second in order to get his brand of the first, a tying agreement may work significant restraints on competition in the tied product. *Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *Key Enters. of Delaware, Inc. v. Venice Hosp.*, 919 F.2d 1550, 1560 (11th Cir.1990). Again, the focus is on the impact on the market from the illegal tie, not on the attitude of the putative customer. Accordingly, AVX could have been reluctant, neutral, or willing to buy nodular from Cabot; if Cabot conditioned the purchase of nodular on the purchase of flake, this element would be satisfied. The ineluctable conclusion from the clear law is that because the buyer's state of mind is irrelevant, a plaintiff need not establish

---

34. As will be explained, AVX is barred from asserting any claim based on the purchase of KTaF.

7. Cabot has produced undisputed evidence that AVX negotiated for an increase in the amount of nodular powder to be purchased from Cabot after the Supply Agreement was signed. *See* Docket No. 112–7 at 2; Gilbertson Dep. at 86–87, 164–166; Collis Dep. at 25–26.

8. In the alternative, Cabot contends that AVX's claim is barred by the doctrine of claim preclusion or res judicata because "it is exactly the same claim that AVX previously litigated against Cabot, and lost, in the Massachusetts state courts." Cabot's Memorandum in Support of Summary Judgment at 2–3. *See also Cabot Corp.*, 448 Mass. at 646, 863 N.E.2d 503.

coercion to succeed with its per se tying claim.

AVX Opposition Memorandum at 5–6.

■ The error in AVX's argument is not in its premise that the state of mind of the purchaser is usually irrelevant in analyzing the market impact of a tying claim, but in its assumption that a refusal to sell products (singly or in tandem) on anything but a long-term basis constitutes "tying" for purposes of the Sherman Act. The teaching of *Illinois Tool*, as echoed by the First Circuit in *Borschow* and *Data General*, is that the defining element of a tying claim is exploitation by the seller of its market position. "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Illinois Tool*, 547 U.S. at 34–35, 126 S.Ct. 1281, quoting *Jefferson Parish*, 466 U.S. at 12, 104 S.Ct. 1551. *See Borschow*, 96 F.3d at 17 (same). *See also Data General*, 36 F.3d at 1156 (The court found "insufficient proof of a tying agreement to withstand summary judgment" where there was no evidence of exploitation and "no explicit tying condition in any written agreement.").

■ Here, AVX offers no evidence that Cabot had a sufficiently dominant market position to "force" it into a multi-year purchase agreement for a product that it did not want. AVX only says that it might have purchased less nodular product in some years, or that its European subsidiaries might have purchased tantalum supplies during other years from Cabot competitors like Showa, Starck, or Ningxia "at substantially less cost." [9] AVX Memorandum at 6 n. 5. This speculation falls far short of proof that Cabot exploited a market position over the flake tantalum market "to distort consumer choice with respect to the tied [non-flake] product."

AVX's only counter-argument is its insistence that the parties' contract serves as independent verification that Cabot "conditioned," that is, would not sell, flake powder to AVX unless it agreed to purchase nodular powder.[10] AVX relies on Section 2 of the Supply Agreement, which states that "Buyer shall purchase ... the minimum purchase quantity ... of each Product described on Appendix A." AVX contends that this "clear" language, as interpreted by its witness-employees, Kurt Cummings, Peter Collis, and John Chapple (AVX's Purchasing Manager), supports its "conditioning" argument.

The testimony does not bear out AVX's contention. Cummings and Collis testified only that Cabot refused to sell AVX tanta-

---

9. In making this argument, AVX is forced to acknowledge that alternative suppliers of tantalum products were available in the market.

10. In its briefing, AVX states that the product over which Cabot is alleged to have market power is "flake" tantalum powder (which is designated as the "tying product"). The products that are associated with that product are the "tied products," in this case, "non-flake products, nodular powder and KTaF." AVX Opposition Memorandum at 4 n. 3. Cabot counters that AVX's "belated attempt" to include semi-refined tantalum ore or KTaF as

a tied product must fail as the Complaint references non-flake *powders*, which cannot include raw materials such as KTaF. Moreover, Cabot notes that AVX's economic expert Dr. Steven Schwartz testified in a February 2008 deposition that he "no longer makes the assertion that [AVX's] purchases of flake were conditioned on [its] purchases of KTaF." Schwartz Dep. at 50. The injection of KTaF at this stage of the litigation is illustrative of a distressing habit of AVX's counsel to attempt by stealth to recapture positions lost by AVX in previous skirmishes.

lum, whether flake or non-flake (or both), unless AVX agreed to a long-term contract. On December 5, 2007, Collis during a Rule 30(b)(6) deposition directed to (among other topics), the "products or terms that AVX alleges it was forced to accept on account of 'Cabot's coercive strategies' as referenced in Paragraph 30 of [its] Complaint," testified as follows.

DAVIS: Okay. Going back to [the Complaint] and Jury Demand at Paragraph 1, Mr. Collis, what are the non-flake powders that AVX claims that Cabot conditioned AVX's purchase of flake powders upon?

COLLIS: Actually the nodular powders and the fact that we had to take a five year contract for these materials.

DAVIS: Looking back please at [the Supply Agreement], which are the nodular powders that AVX did not wish to purchase from Cabot as of the time that this contract was executed?

GOREN: Objection.

DAVIS: You can respond.

COLLIS: There is the nodular on Biddeford, the nodular under Europe. There's wire under Biddeford, wire under Europe and KTaF for the extent of the five year contract.

MR. DAVIS: So I want to understand this correctly. Are you saying that AVX did not wish to purchase, as of the time that it entered into this supply agreement with Cabot, it did not wish to purchase any nodular powder from Cabot?

COLLIS: We didn't wish to purchase—enter into an agreement to purchase materials for five years.

DAVIS: Putting aside the five year length of the contract, were there any nodular products that are listed on ... the Supply Agreement that AVX actually wished to purchase from Cabot as of the time that this supply agreement was actually signed? Independent of the five year length of the contract.

COLLIS: Yes. Yes.

DAVIS: Which ones did AVX actually wish to purchase?

COLLIS: We wished to purchase the ones that we had in the Letter of Intent at the time that we had the original agreement.

\*     \*     \*

DAVIS: Is it fair to say that it's AVX's position that its complaint in this case is that it was forced by Cabot to sign a contract for years beyond 2001?

COLLIS: Yes.

DAVIS: Is there more to AVX's complaint in this action other than it was forced by Cabot, allegedly, to sign a contract or a binding contract for delivery of products beyond the calendar year 2001?

COLLIS: No.

Collis's testimony concerning the nature of AVX's claim was confirmed by Cummings, AVX's Chief Financial Officer, at his Rule 30(b)(6) deposition on December 12, 2007. He was asked to identify the "coercive strategies" exerted by Cabot that are alleged in Paragraph 30 of AVX's Complaint. Cummings testified as follows.

Q. And what were Cabot's coercive strategies, to your understanding?

A. I believe they surrounded the conditions under which the Supply Agreement was negotiated.

Q. They surrounded? Is that the word you just used?

A. Urn-hum.

Q. Surrounded with what?

A. Two issues. One, we had an existing supply agreement which Cabot indicated they would not honor.

Q. You are referring to the letter of intent?

A. Yes. And we were told that we would not get material unless we en-

tered into a long-term supply agreement.

Q. And that is the coercive strategies you believe this is referring to?

A. Yes.

Q. What other coercive strategies are you aware of that Cabot engaged in during the negotiation of the 2001 Supply Agreement?

A. I think that covers it.

Cummings Dep. at 17–18.

Chapple, in a subsequent affidavit, states that it was his understanding that if AVX did not enter into a five-year supply contract for both flake and non-flake products, it would not get any flake for 2001. Chapple Aff. ¶ 22.[11] Cabot asserts that the Chapple Affidavit should not be considered by the court as it is "inconsistent with the testimony of the same witness at his deposition" about a meeting between Chapple and Cabot's Hugh Tyler at Heathrow Airport in August of 2000. AVX asserts (somewhat ingenuously) that the affidavit does not contradict, but rather "amplifies upon" Chapple's earlier testimony. AVX Reply at 4. The court agrees that the affidavit is improper. *See Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4–5 (1st Cir.1994) (" 'When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.' " (quoting 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2726 at 30–31 (2d ed. 1994))). Perhaps

more to the point, Chapple's carefully crafted affidavit concedes (albeit in a more weaseling fashion than his testimony) that he was told that Cabot would not provide any product to AVX in 2001 unless it entered into a five-year, minimum purchase contract for the products it wanted.

There is one remaining dispositive issue. AVX must show "injury in [its] business or property by reason of anything forbidden in the antitrust laws" in order to have standing as a plaintiff. *See Wells,* 850 F.2d at 815. *See also Borschow,* 96 F.3d at 17 (finding that plaintiff failed to adduce evidence that it was injured by defendant's alleged anticompetitive acts). In *Wells,* the First Circuit cautioned that "it is proper to indulge private antitrust plaintiffs only to the extent there is evidence on the record from which a trier of fact could make a 'just and reasonable inference' regarding the amount of damages. If the plaintiff's proffered evidence permits no more than 'pure speculation and guesswork' then the damage evidence is insufficient as a matter of law." *Wells,* 850 F.2d at 816, quoting *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). *See also Telecor Commc'ns, Inc. v. Southwestern Bell Tel. Co.,* 305 F.3d 1124, 1151 (10th Cir.2002) (An "antitrust plaintiff has the burden of proof and damages cannot be speculative.").

AVX here has offered no reliable evidence of damages.[12] *See Texaco Inc. v. Hasbrouck,* 496 U.S. 543, 572–573, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990) ("We have held that a plaintiff may not recover damages merely by showing a violation of

---

11. "AVX did not want to commit to purchase from Cabot any fixed amounts of tantalum products for each 2002, 2003, 2004 and 2005 at fixed prices.... [O]nce as a condition of getting the flake products AVX accepted Cabot's requirement of a five year take or pay contract for both flake and non-flake products the negotiations were limited to the quantities

to be purchased over the five years and the prices to be paid." AVX Response to Cabot's Statement of Facts at 13.

12. The Supply Agreement terminated in 2005. AVX is not seeking injunctive relief. *See* Complaint at 9.

the Act; rather, the plaintiff must also 'make some showing of actual injury attributable to something the antitrust laws were designed to prevent.'" (quoting *Perkins v. Standard Oil Co.,* 395 U.S. 642, 648, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969))). AVX's dilemma is one of its own making. Despite repeated accommodations by the court, including granting of numerous extensions of the scheduling order (four in all), AVX failed (or was unable) to produce expert testimony identifying any actual damages.[13] The extensions culminated on July 10, 2007, with the margin order that "[n]o further extensions will be granted." Nonetheless, because of a death in the family of plaintiff's counsel, the court again extended the expert deadline, setting December 15, 2007, as the date for AVX's submission of its expert report.[14]

On October 18, 2007, the court allowed AVX's motion to substitute a new expert, Steven Schwartz, in lieu of a prior expert who, because of medical issues, was unable to travel to view AVX's manufacturing facility in the United Kingdom. Cabot vehemently opposed the motion, contending that AVX should be bound by the prior expert's affidavit testimony. The court allowed AVX's motion. AVX submitted Schwartz's expert report on December 15, 2007. Schwartz's report, however, did not contain a calculation of AVX's damages.[15] Cabot served its expert report on January 15, 2008, noting the absence of any damages evidence. On February 8, 2008, AVX filed a motion seeking leave to file a substitute expert report. In doing so, AVX admitted that Schwartz's report was "incomplete."[16] The court denied the motion as untimely. It did allow AVX to file an addendum limited to issues raised by additional discovery allowed by the court in a separate order on February 15, 2008.

Finally, AVX failed to provide timely substantive answers to Cabot's damages interrogatories or to otherwise respond when asked to identify its damages claim.[17]

---

**13.** See *Nilavar v. Mercy Health Sys.–Western Ohio,* 244 Fed.Appx. 690, 693 (6th Cir.2007) (affirming the district court's finding on a motion for summary judgment that "plaintiff's claims failed as a result of his failure to have expert testimony on the geographic market and ... he could not [therefore] show an antitrust injury."); *Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 490 (7th Cir.2002) ("The physical copper market is complicated, but not so complicated that one cannot estimate to a reasonable degree of accuracy the amount of damage a party has sustained. It is certainly acceptable through expert economic testimony to make a reasonable estimation of actual damages through probability and inferences.").

**14.** The extended dates were set out on the court docket as December 15, 2007—AVX's expert report deadline; January 15, 2008—Cabot's expert report deadline; March 1, 2008—completion of expert discovery; and March 31, 2008—filing of dispositive motions.

**15.** See Gregory J. Werden, *Economic Evidence on the Existence of Collusion: Reconcil-*

*ing Antitrust Law with Oligopoly Theory,* 71 Antitrust L.J. 719, 789 (2004) ("The role of the expert economist in antitrust cases is to apply microeconomic theory to the messy facts of a case.").

**16.** At a deposition held on February 19, 2008, Schwartz testified as follows:

Q. But you didn't issue any opinions regarding damages in the expert report that you submitted back in December, correct?
A. That is correct.
Q. And you hadn't been asked to at that point in time, correct?
A. That is correct.
See Schwartz Dep. at 201–202.

**17.** On December 5, 2007, as previously noted, Cabot took the Rule 30(b)(6) deposition of AVX's Peter Collis. One of the topics of the Collis deposition was damages: "Any damages that AVX claims to have sustained on account of the conduct alleged in the Complaint, including but not limited to the complete nature and amount of such damages, and the precise means by which AVX calculated such damages." Collis was unable to ar-

As a consequence, Magistrate Judge Bowler (to whom the ongoing discovery disputes had been referred) allowed Cabot's motion to strike AVX's answers to the damages interrogatories.[18] *See AVX Corp. v. Cabot Corp.*, 251 F.R.D. 70 (D.Mass. 2008). In her opinion (which was adopted by this court), Magistrate Judge Bowler did allow that "AVX may file a motion for leave to file, *see* L.R. 7.1(b)(3), a revised answer to the damages interrogatory based only on the information recently obtained from Cabot in March and April 2008." No revised damage calculation was ever offered by AVX. As AVX is unable to demonstrate that it has in fact suffered quantifiable damages as the result of any conduct attributable to Cabot, Cabot's motion for summary judgment will be granted on this ground as well.

### ORDER

Based on the foregoing reasons, Cabot's Motion for Summary Judgment is *ALLOWED*. The Clerk will enter judgment for Cabot and close the case.

SO ORDERED.

ticulate any method of calculating damages. When asked if he had any understanding of the monetary value of AVX's alleged damages, Collis stated that AVX had "monitored the market price of material and compared that with what we ended up paying in the contract when we used the material as against what the market price was at the time, and passed that to our expert." When asked how he would calculate AVX's damages he responded that "we've left that with our expert to come up with that calculation."

18. Federal Rule of Civil Procedure 37(c)(1) provides that "a party that without substantial justification fails to disclose information required by Rule 26(a) ... shall not, unless such failure is harmless, be permitted to use evidence at a trial ... any ... information not so disclosed." "The required sanction in the ordinary case is mandatory preclusion." *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st Cir. 1998) (discussing failure to disclose letters written by the plaintiff's wife to her sister). *See also Pena–Crespo v. Commonwealth of Puerto Rico*, 408 F.3d 10, 13 (1st Cir.2005) (" '[E]xclusion of evidence is a standard sanction for a violation of the duty of disclosure under Rule 26(a).' "); *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir.1998) ("The sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless.").